**Linda M. LAVERY and Gerard D. Lavery, Plaintiffs,**

v.

**Mark A. KEARNS and First NH Banks, Defendants.**

**Civ. No. 90–0028 P–C.**

United States District Court, D. Maine.

April 30, 1992.

banks, Congress has expressly authorized inter-

state branching by thrifts. *Id.* at 12205.

C.F.R. § 240.10b–5; 32 M.R.S.A. § 10101 *et seq.;* N.H.Rev.Stat.Ann. § 421–B:1 *et seq.;* Mass.Gen.Laws Ann. ch. 110A, and the Racketeer Influenced and Corrupt Organizations Act [RICO], 18 U.S.C. § 1962(c). They also allege common law actions for fraud, negligence, breach of fiduciary duty and breach of contract. A jury trial was commenced on November 8, 1991. Following the Court's denial of a motion for a mistrial after four days of testimony, the jury was discharged, and the trial continued, by agreement of the parties, before the Court alone. The Court makes the following findings of fact and conclusions of law.

## I. GENERAL FINDINGS OF FACT

Plaintiffs Linda and Gerard Lavery are residents of Tyngsboro, Massachusetts. Mr. Lavery is a firefighter and Mrs. Lavery an elementary school teacher. Defendant Kearns is a resident of Kennebunk, Maine. Although trained as a lawyer, in the mid 1980's he became a real estate developer in partnership with James Waterman. Waterman was initially a Defendant in this suit, but after he filed a Chapter 7 bankruptcy petition, proceedings against him were stayed. Defendant First NH Banks is a New Hampshire bank corporation which acquired Granite State National Bank of Rochester, New Hampshire in the early 1980's.

In 1985 Defendant Kearns, Waterman and James Ackroyd formed a corporation to buy the Bellevue Inn near Wells Beach in Maine. They planned to buy the motel, improve it, convert it to condominiums, and sell the individual units. The purchase and improvements were financed with a loan of $550,000 from Granite State National Bank. In 1986 Plaintiffs bought unit B–15 at the Bellevue for $54,900 to use as a vacation home and as an income-producing property. Plaintiffs borrowed the full purchase price of the condominium from a Massachusetts bank using the equity in their Massachusetts home as collateral for the mortgage. In order to rent the Bellevue unit when they were not using it, Plaintiffs entered into a management con-

Jeffrey Rosenblatt, Berman & Simmons, Lewiston, Me., for plaintiffs.

Mark A. Kearns, Wells, Me., for defendants.

Gregory A. Tselikis, Bernstein, Shur, Sawyer & Nelson, Portland, Me., for First NH Banks.

## OPINION AND ORDER

GENE CARTER, Chief Judge.

Plaintiffs here seek recovery for losses they suffered after buying a condominium sold to them by Defendant Kearns and financed by Defendant First NH Banks. Plaintiffs have alleged violations of both federal and state securities laws, 15 U.S.C. § 77*l* (1) and (2); 15 U.S.C. § 78j(b); 17

tract with Roger Sibley. They received about $3000 annually in rental income and paid about 35% to 40% of the gross income received on the unit to Sibley in the period from 1986 to 1987.

Around the same time, Kearns and Waterman were also developing a number of other projects. These included the Shawmut Inn, the Inn at Goose Rocks and Ocean 18, a development planned around a golf course. These developments were financed with numerous loans, letters of credit, mortgages and other financing devices provided primarily by Granite State and First NH Mortgage Company, a separate lending entity that is a subsidiary of First NH Banks.

In November 1987 Plaintiffs were invited by Atlantic Hospitality Co., a Kearns and Waterman enterprise established to manage their hotels, condominiums and restaurants, to attend a presentation at the Shawmut Inn concerning conversion of the Bellevue condominium units to "quarter shares". The condominium market had slowed on the southern coast of Maine, and Kearns and Waterman saw quartersharing, a system which they had read about and viewed an example of in South Carolina, as a way of stimulating sales of the remaining unsold units.

Plaintiffs attended the meeting with a number of other Bellevue owners. No one from Defendant First NH was present. During the presentation Plaintiffs learned about the quarter share concept, under which a condominium is divided into four equal fee simple estates, which are then sold separately. Each quarter share owner has use of the unit for thirteen weeks on a revolving schedule. Plaintiffs also learned about a similar project at another Kearns and Waterman development, the Inn at

Goose Rocks. Plaintiffs were told that for quartersharing to be available at the Bellevue, all of the members of the Bellevue Condominium Association would have to consent to amendment of the condominium declaration. Ultimately, the Laverys and all but one of the other owners agreed to the amendment, and full consent was achieved after Waterman and Kearns bought out the one dissenting owner.

A number of possible management plans for the developments were described at the meeting by Kearns and Waterman. The one that has become pivotal in this suit provided an opportunity for condominium purchasers to lease the units back to Atlantic Hospitality and to sell the units back to Kearns and Waterman at the end of a fixed period for a fixed price.[1] It was plain from the presentation and from the written materials provided to Plaintiffs that the lease/buyback management plan was optional.

At the presentation Plaintiffs also received a booklet entitled "Quarter Share Analysis", prepared by real estate analyst John Lane. The analysis made various projections concerning the profits to be achieved through sales of quarter shares and purchase of the units under the lease/buyback option. Under one scenario, after a twenty percent down payment, there would be no out-of-pocket expenses associated with the purchase of the condominium because the lease payments would cover all costs. At the time of the buyback, purchasers could sell the unit for a price representing the purchase price plus a return of 15% of the downpayment per year.[2]

As a result of the presentation by Waterman and Kearns, Plaintiffs decided in November 1987 to purchase an additional unit

---

1. Plaintiffs were already somewhat familiar with the lease/buyback concept. In the Spring of 1987, Plaintiffs had been offered and had planned to buy from Kearns and Waterman a condominium at the Shawmut Inn. It had been offered with a lease/buyback similar to the one proposed at the Bellevue. Plaintiffs backed out of the transaction for family reasons after signing a purchase and sale agreement from Kearns and Waterman.

2. In March 1988 Kearns's attorney reviewed the Lane Report and other aspects of the Bellevue sales promotions and advised him to take certain actions to reduce the risk that the transactions might be considered securities. Kearns evaluated the opinion and decided that the risks were very slight. He did not register the offering as a security or comply with the disclosure requirements of the securities laws.

at the Bellevue, B–23, to convert their original unit to quarter shares, and to buy a unit at the Inn at Goose Rocks. They chose to enter into lease agreements on all three units and buybacks on the two new units. There is no dispute that Plaintiffs, who owned both a home and a condominium for their retirement in Massachusetts, purchased Bellevue unit B–23 and the Goose Rocks unit for investment purposes.

In January 1988, the Laverys received a letter from James Kavanagh, a salesperson for Waterman and Kearns, introducing Ocean Sales, Inc., another Kearns and Waterman development project. The letter mentioned "the substantial return on your initial investment" available as a result of the lease/buyback agreements and indicated that in-house closings and completion of loan applications and related documentation would be available for purchasers of condominiums. James Kavanagh suggested that the Laverys apply for a loan from Peoples Heritage Bank, and he sent them an application form for that bank. The Laverys filled out the Peoples Heritage application and signed a blank application form for Granite State National Bank,[3] Defendant's predecessor. Despite the suggestions and assistance of Kavanagh, the Laverys knew that they could seek financing at whatever bank they might choose. The loan request was ultimately sent to and processed by Granite State. At the time Plaintiffs had a good credit rating and a net worth of $227,630, and the loan application was approved.

Sometime before the closing, Plaintiffs saw at the Bellevue a First NH publication, the "First Report" which featured an article about the ongoing enterprises and development plans of the Bank's customers Kearns and Waterman. The "First Report" was also observed by the Laverys to be available in the lobby of the Bank on April 8, 1988, the day Plaintiffs closed their mortgage loan.

Before the closing Mrs. Lavery had prepared a list of questions concerning the transaction into which they were entering. She asked the questions of Dorothy Ward, the loan officer who represented the Bank at the closing, and testified that the questions were answered satisfactorily. There is dispute about what was asked and what the replies were.

At the April 8 closing, Plaintiffs borrowed a total of $158,000 to purchase unit B–23 at the Bellevue and unit 5 at the Inn at Goose Rocks. The Bellevue unit, which is the subject of this suit, cost $58,000. Plaintiffs gave the Bank a first mortgage on their B–15 unit at the Bellevue as well as on the two new units. The loan documents were prepared by the Bank, and the mortgage rate was in excess of that generally available for residential property. The lease and buyback agreements, which Plaintiffs also signed at the closing, were prepared by Waterman and Kearns.

At the time of the closing, Waterman and Kearns had substantial loans outstanding to both Granite State and the First NH mortgage company. They were current on their loans, however, and paid them according to their terms. In March of 1988, Kearns and Waterman discussed with Granite State officials the possibility of developing a ten or twelve million dollar project at Moosehead Lake. The Bank declined to finance the project finding it not to "make sense" for either Kearns and Waterman or for itself. Tr. V, at 315. Although the Bank was concerned about the debt to be incurred, a bank official testified that it was more concerned about the likelihood that from a managerial standpoint Kearns and Waterman would spread themselves too thin if the project were approved. Tr. VI, at 553. The Bank did loan more money to Kearns and Waterman on April 11, 1988 for purchase of land at Lands End. In November 1988, seven months after Plaintiffs bought their new units, Kearns defaulted on the lease payments. In order to make mortgage payments to the Bank during the following

---

3. There is some mystery surrounding the Granite State application. It was clearly signed by Plaintiffs, but they had not filled it out. The information, however, was basically the same as that included on the Peoples Heritage application. The Court finds that Kavanagh filled it out and sent it to the Bank after it had been signed by the Laverys.

year, Plaintiffs borrowed money from Mr. Lavery's ICMA retirement fund and another IRA and took a home equity loan from another bank. They defaulted on the mortgage in late December, 1989 and the Bank began foreclosure proceedings in January 1990.

The foregoing are the basic facts detailing the transactions underlying Plaintiffs' lawsuit. The Court will make further findings as necessary in its discussion of the legal issues raised by Plaintiffs' claims.

## II. APPLICATION OF THE SECURITIES ACTS

Plaintiffs allege that Defendants have violated the Securities Act of 1933, 15 U.S.C. § 77*l* (1), by failing to register the sale of the Bellevue condominium with its attendant lease/buyback program as a "security" and to provide potential investors with the information required by the Securities and Exchange Commission for the sales of securities. They also allege that Defendants have violated provisions of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b), 17 C.F.R. § 10b–5, which in essence prohibit fraud in connection with the sale of securities, and 15 U.S.C. § 77*l* (2), prohibiting provision of materially misleading information to purchasers of securities. Plaintiffs also seek recovery under the Massachusetts, Maine and New Hampshire analogs of the federal securities laws, asserting that "the liability of Kearns and First NH Bank, under the federal laws should also render them liable for violations of these three states' securities laws." Plaintiffs' Post Trial Memorandum of Law, at 33.

In order to apply any of these laws to Defendants, the Court must first determine whether the transaction in which Plaintiffs bought the Bellevue unit with the lease/buyback program constitutes a security. Under the federal securities laws, "security" is defined to include an "investment contract." 15 U.S.C. § 78c(a)(10). The classic definition of an investment contract was set forth long ago by the Supreme Court in *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). It includes "any contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third person." *Id.* at 298–99, 66 S.Ct. at 1102–03. In deciding whether a transaction is an investment contract, the Supreme Court has enjoined lower courts to look at the economic reality of the situation presented, rather than taking a formalistic approach to the facts. *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 848, 95 S.Ct. 2051, 2058, 44 L.Ed.2d 621 (1975).

Applying the *Howey* test to the transaction at issue here, the Court finds no dispute over the first element. Everyone agrees that Plaintiffs invested money to buy the Bellevue condominium.

The second prong of the *Howey* test is more difficult to apply, in part because the circuit courts of appeal are not in agreement concerning what is meant by the term, "common enterprise." Some courts require "horizontal commonality," *i.e.*, the pooling of assets from two or more investors into a single investment fund, usually combined with a *pro rata* sharing of profits. *Hocking v. Dubois*, 839 F.2d 560, 566 (9th Cir.1988), *approved en banc*, 885 F.2d 1449, 1459 (9th Cir.1989). Other courts require that there be "vertical commonality," which focuses not on whether there is an enterprise common to the aggregate of investors, but rather on whether there is a venture common to the dyad of the promoter and the investor.

■ There are two tests for vertical commonality, however. To establish so-called "broad vertical commonality," a plaintiff must show merely a link between the investor's fortunes and the promoter's efforts. *SEC v. Koscot Interplanetary, Inc.*, 497 F.2d 473 (5th Cir.1974). Another test for "narrow commonality," which is a compromise approach between requiring horizontal commonality and broad vertical commonality, finds a common enterprise when the investment manager's fortunes rise and fall with those of the investor. *Savino v. E.F. Hutton & Co.*, 507 F.Supp. 1225, 1237

(S.D.N.Y.1981); *SEC v. Glenn Turner Enterprises, Inc.*, 474 F.2d 476 (9th Cir.1973).

In *Xaphes v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 597 F.Supp. 213, 216 (D.Me.1984), this Court, agreeing with a number of other district courts in this circuit, noted that the test for broad vertical commonality was the functional equivalent of the third *Howey* test, that the investor is led to expect profits solely from the efforts of the promoter. *See, id; Holtzman v. Proctor, Cook & Co.*, 528 F.Supp. 9, 16 (D.Mass.1981) (McNaught, J.). Therefore, this Court as well as the others rejected the broader view of vertical commonality since it essentially eliminates the common enterprise element of the *Howey* test.

■ The Court of Appeals for the First Circuit, like the United States Supreme Court, has not yet spoken on what the appropriate test for a common enterprise under *Howey* should be. Most of the District Courts in this circuit have required narrow vertical commonality for a finding of common enterprise. *See Sampson v. Invest America, Inc.*, 754 F.Supp. 928, 933 (D.Mass.1990). The most recent case addressing the common enterprise issue, however, adopts the horizontal commonality requirement in the context of a land sales and development project, without extensive discussion of the other standards. *Rodriguez v. Banco Central*, 777 F.Supp. 1043, 1057 (D.P.R.1991). In the case currently before the Court, it is not necessary to predict whether one of the common enterprise tests will be adopted over the other

by the Court of Appeals [4] because Plaintiff has failed to show either horizontal or narrow vertical commonality.

The facts as presented at trial show that Plaintiffs agreed to buy a condominium at the Bellevue. The lease and buyback agreements were set forth in written contracts, signed by Plaintiffs on April 8, 1988 when they closed the purchase of the Bellevue unit. Under the lease agreement, Plaintiffs leased unit B–23 at the Bellevue to Atlantic Hospitality, Inc., a Kearns and Waterman entity, for a term of five years. The agreement provided that the unit would be rented to customers at rates and under conditions exclusively determined by Atlantic Hospitality. PX 17A. It also provided that Atlantic Hospitality would pay all the costs associated with rental of the unit, including those for promotion, reservations, accounting, personnel, electricity, condo fees, real estate taxes, insurance, cable tv, and materials such as linens. *Id.* Atlantic Hospitality also assumed responsibility for cleaning and maintenance of the unit and for damage to the furniture and contents of the unit.

Atlantic Hospitality agreed to pay Plaintiffs $416.18 monthly. This figure coincided with the amount that Plaintiffs had to pay for their mortgage on the unit. The lease provided that if Plaintiffs decided to sell quarter shares, Ocean Sales, Inc., another Waterman and Kearns entity, would have the right to market them. If a quarter share of the unit were sold, the monthly rental would be decreased by one third, and Atlantic Hospitality would give up any

---

4. In *Savino v. E.F. Hutton,* 507 F.Supp. at 1238, the court persuasively explained that either vertical or horizontal commonality should be adequate to show a common enterprise:

> The test set forth in *Howey,* as the Court itself there stated, "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *SEC v. W.J. Howey Co.,* ... 328 U.S. at 299 [66 S.Ct. at 1103] By its terms the common enterprise component of the *Howey* test states merely that the financial relationship that is to be labeled an "investment contract" must include two or more parties whose profits or losses are interdependent to a certain

extent. Nothing in the language of *Howey* mandates that this relationship be horizontal, that is, between an investor or one or more other investors. The cases that have opted for horizontal commonality have not, in the Court's view, stated any convincing rationale for confirming *Howey* in this manner. It is plain enough that a vertical relationship, that is, a one-to-one relationship between the investor and the investment manager, is capable of being structured so that the profits and losses of the two parties are somehow interdependent.

The Court of Appeals for the Ninth Circuit also permits either a horizontal or vertical relationship as a basis for a common enterprise under *Howey. Hocking v. Dubois,* 885 F.2d at 1459 (9th Cir.1989).

rights in that quarter share. The lease provided that Plaintiffs could occupy the unit for up to 14 days per year at a reduced rate. The final provision in the lease allowed termination by Plaintiffs at any time upon thirty days notice.

█ The buyback agreement, titled "Contract for the Purchase and Sale of Real Estate," provided that Plaintiffs would sell unit B–23 at the Bellevue to Kearns and Waterman on April 8, 1993 for $67,476. PX 18A.[5] Plaintiffs could cancel the contract at any time upon thirty days notice. *Id.*

### A. *Vertical Commonality*

In light of the provisions of these contracts governing the relationship between the parties, the Court cannot find that there was a common enterprise in which either the fortunes of Plaintiffs and a group of investors were joined or the fortunes of Plaintiffs and the promoters were intertwined. The lease, with its fixed payment term, makes it contractually impossible for Plaintiffs to share profits or losses with anyone. Under the contract Plaintiffs are to receive $416.18 per month. This amount does not vary with the amount of rental money received by Atlantic Hospitality. If more than $416.18 is received in a given month, Plaintiffs do not receive more because the unit has been more profitable. If less than $416.18 is received, Plaintiffs do not receive less. By virtue of the contract's limitations, Atlantic Hospitality, the Kearns and Waterman entity, reaps any

extra profits and absorbs any losses generated by the rental of the B–23 unit. There is, therefore, no vertical commonality, for the fortunes of Plaintiffs are not intertwined with those of the promoters.

The buyback contains similarly fixed amounts, insulating Plaintiffs from the vagaries of the market if they chose to exercise it. Any risk of loss was placed by the buyback contract on Waterman and Kearns because they were obligated to pay $67,476 for the condo in April 1993 no matter what the prevailing market price might be. If Plaintiffs had chosen to terminate the buyback agreement and make a substantial profit because of soaring market prices, Waterman and Kearns would not have shared in that profit. Both the lease and the buyback, the documents governing the terms of Plaintiffs' transaction with Defendants, indicate quite plainly that the parties were not engaged in a common enterprise characterized by vertical commonality.

In *Sampson v. Invest America, Inc.*, 754 F.Supp. at 934, the court found vertical commonality where the plaintiff investors bought solar hot water systems and entered into a service contract which provided for the lease, installation and management of the solar units to Nevada homeowners:

> In the present case, the homeowner lessee sends all payments to Starlite. Starlite, in turn, sends a portion of these monies to the investor; here the Sampsons. *The contract explains* that this revenue derives from two sources.

---

**5.** The language of the buyback agreement is ambiguous because it provides that the closing on the buyback shall take place "on or before April 8, 1993 and time shall be of the essence." It also provides for cancellation by Plaintiffs on thirty days notice. Plaintiffs have tried to convince the Court that the buyback agreement would have permitted Kearns and Waterman always to defeat the Plaintiffs' right to cancel by insisting on a closing on the buyback before the thirty day notice period had expired.

Under Maine law, which governs this contract because Maine has the most significant relationship to the transaction and the parties, *Baybutt Construction Corp. v. Commercial Union Insurance Co.*, 455 A.2d 914 (Me.1983), *overruled on other grounds, Peerless Insurance Co. v. Brennon*, 564 A.2d 383 (Me.1989), extrinsic evidence may be used to construe an ambiguous writing.

*Hartford Fire Insurance Co. v. Merrimack Mutual Fire Insurance Co.*, 457 A.2d 410 (Me.1983). The testimony of the parties here made clear that they both intended the buyback to take place five years after the signing of the agreement, and that the agreement was not intended to allow Kearns and Waterman to demand closing at any time before the assigned date. Mrs. Lavery testified that the timing of the buyback was important because her oldest son would be going to college in five years. On cross-examination she reiterated her understanding that the buyback obligation would come due in 1993. Kearns similarly testified that the agreement would operate so that he and Waterman would either list the property for sale or take out a loan to buy it outright at the end of the five year period.

First—for a period of two years—the Sampsons are to receive a forty dollar monthly payment resulting from the sale of parts incident to the Solar unit's installation. If Starlite fails to lease the Solar units or if the customer defaults on her obligation to pay for these parts, then the source of this revenue evaporates and the Sampsons cannot, *by the terms of their contract*, receive this revenue. The Sampsons' second source of revenue also depends for its existence on the success of Starlite's ability to find (and collect money from) lessees.... The more units Starlite leases, then the greater the revenue for investor and broker alike.

The Court in *Sampson* relied on the terms of the contract to establish the nature of the transaction between the parties. In *Sampson* the contract specified what the source of payments to the investor would be and made such payments contingent upon income from that source, thus creating the necessary interdependence between the fortunes of the investor and of the promoter. Here, despite Plaintiffs' urgings, the lease simply says that Atlantic Hospitality must pay; it does not state that Atlantic Hospitality will pay out of specific funds. Payment under the lease is thus not conditioned upon successful rental of the units, and rental of the unit beyond what is necessary to pay the lease amount results in greater revenue for Atlantic Hospitality, the broker, only.[6]

■ Plaintiffs urge the Court to apply a broader perspective and find that Plaintiffs' prospect of receiving lease payments and recouping their investment with the buyback was dependent on Kearns's success in obtaining construction financing for the Shawmut Inn and on the success of all of the Kearns and Waterman projects. The Court agrees with Defendants, however, that this approach would merely collapse the second prong of the *Howey* test into the third, which requires that Plaintiffs have expected profits solely from the efforts of the promoter.[7] The court in *Elson v. Geiger*, 506 F.Supp. 238, 243 (E.D.Mich.1980), a case dealing with a partnership and a sale-leaseback, addressed and rejected an argument similar to that raised by Plaintiffs here. Although the *Elson* court treated the argument as one under the reliance prong of *Howey*, its reasoning makes sense in evaluating the common enterprise element as well. The court stated:

The return on investment that had been promised to the purchasers was the lessee's fixed rent payment, which was totally independent of its profits or managerial expertise. Although the Plaintiffs argued that seller-lessee's managerial

---

6. In *Sampson,* the Plaintiffs had another investment which the court also found to be an investment contract. In this investment plaintiffs purchased limited partnership units of Stanley Manor, a resort located in Colorado. The court stated:

The profitability of Stanley Manor House depends solely on the general partner's capacity in attracting tourists and running a tight ship. The general partner's income and the return on the Sampson's investment depend on the profitability of the Stanley Manor House. Thus, a common enterprise exists.

*Sampson,* 754 F.Supp. at 934. While the *Sampson* court here may be eliding the second and third *Howey* tests, the case now before the Court is still plainly distinguishable. In this case, the return on Plaintiffs' investment is not dependent on the profitability of the Bellevue, for the parties entered into an agreement in which the risk of unprofitability was apparently assumed by the lessees.

7. Plaintiffs also seek to persuade the Court that the evidence in this case is similar to that in *Hodges v. H & R Investments, Ltd.,* 668 F.Supp.

545 (N.D.Miss.1987), where the court found a common enterprise. In *Hodges,* plaintiff had bought a condominium with the down payment financed by and rentals guaranteed by the developer, and an assurance that he could terminate the plan with no loss after one year, with the developer assuming his obligations. Relying in major part on SEC Release No. 33–5347, the court found the transaction to be an investment contract. In specific response to Defendant's argument that there was no common enterprise, the court stated that "[t]he value of the units themselves, irrespective of any rental prospects, was 'inextricably tied' to the efficacy of Howard's and Rhett's future sales efforts." *Id.* at 550. In determining that a common enterprise existed, the *Hodges* court was clearly applying the broad vertical commonality test, rejected by most of the District Courts in this circuit. The similarity of the factual situation in *Hodges,* therefore, does not lead this Court to accept that court's legal conclusion.

ability was requisite to a continuation of the timely rental payments, this contention alone does not meet the *Howey* test. Every lessor, in some measure, is reliant upon his commercial lessee's ability to manage the business profitably; however such reliance will not render every commercial lease a security.

*Id.*

Plaintiffs also argue that *Savino v. Hutton*, 507 F.Supp. at 1237, establishes a relatively relaxed standard for vertical commonality, by requiring merely a "correlation" between the success or failure of the investment manager and the profit or loss of the investor. The court in *Savino*, however, found vertical commonality in a situation where Defendants were to earn a bonus equal to ten percent of the profits shown by the Plaintiff's accounts. *Id.* at 1239. The court explained that it understood "correlation" to mean that "the investment manager's fortunes rise and fall with those of the investor." Here, the relationship between Plaintiffs and Kearns and Waterman was structured through the contracts to preclude such a correlation.

In *Rodriguez v. Banco Central*, 777 F.Supp. at 1059, the court admonished that it is necessary to look beyond the four corners of the written documents in determining the existence of an investment contract: "Promotional materials, oral assurances, and merchandising approaches are all relevant.... 'Characterization of the inducement cannot be accomplished without a thorough examination of the representations made by the defendants as the basis of the sale.'" *Id.* (quoting *Aldrich v. McCulloch Properties, Inc.*, 627 F.2d 1036, 1039 (10th Cir.1980); *see also Hocking v. Dubois*, 885 F.2d at 1457 (also citing *Aldrich*)). Of course, as Defendants here argue, the transaction must be characterized at its inception, not as it develops, for registration of securities must occur before their sale. *See SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 352–53, 64 S.Ct. 120, 124, 88 L.Ed. 88 (1943) ("The test ... is what character the instrument is given in commerce by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect.");

*Danner v. Himmelfarb*, 858 F.2d 515 (9th Cir.1988) (the nature of an instrument as a security is determined at the time of issuance).

Here the evidence shows that Plaintiffs were offered the purchase, lease and buyback of a condominium in a complex owned by Kearns and Waterman and to be managed by their affiliated company, Atlantic Hospitality. The offer of sale of the Bellevue unit did not tie Plaintiffs' profits or losses to those of Waterman and Kearns. Mrs. Lavery testified that Plaintiffs were told that "if [they] were to buy a whole unit at the Bellevue and if the plan for the Bellevue permitted quarter sharing, [they] could recover some or all of [their] money or perhaps make a profit by reselling [their] unit to other people in quarter shares." Tr. III, at 213–14. Kearns also testified that he had marketed the units on the premise that purchasers would make money through market appreciation and that they would be their own developers. Tr. VII, at 1138. This testimony clearly does not describe the type of interweaving of interests with Kearns and Waterman necessary to establish vertical commonality. Similarly, the Lane Report does not link the fortunes of the investors with those of Kearns and Waterman. It merely projects what returns might be for any given individual purchaser.

The letter from Kavanagh, while filled with "puffing" language, in essence simply describes a buyer/seller relationship between letter recipients and Ocean Sales and discusses what services Ocean Sales plans to offer its buyers. At one point Kavanagh describes the buyers as an asset to Ocean Sales, Inc. It is plain, however, that the asset foreseen is not any formal arrangement intertwining the fortunes of the buyers and Ocean Sales, but merely the *possibility* that buyers who are able to successfully market their condominiums may buy more properties from Ocean Sales. The Court cannot find that the quarter share program was offered in any way which significantly linked the fortunes of the investors with those of the promoters.

Similarly, the lease and buyback were not offered as transactions which linked the fortunes of the investors and promoters. When the Laverys purchased the condo, Mrs. Lavery saw the purchase as an investment that would yield the fixed sums provided by the lease and buyback agreements. The evidence plainly demonstrates that Plaintiffs did not desire or plan to enter a common vertical enterprise with Atlantic Hospitality:

Q. Did you have any interest at all in buying a unit and having the management company giving you sort of a 60/40 or 70/30 split of the proceeds from the rental?

A. Absolutely not, it would not have made any sense.

Q. And what was the thing that attracted you to this, if anything?

A. Okay. It was 100 percent. We, by getting involved in this program, I would not have to pay any mortgage payments, I would not have to pay any taxes, I would not have to pay any condo fees and I would not have to pay any maintenance fees, I would not have to pay any insurance fees, absolutely nothing, everything was 100 percent covered. So why would I want to do that? Why would I want anything other than that?

Q. And if we talk for a moment about the buy back components here, what was the interest you had in the buy back component?

A. Buy back was, I would not have to have sold any quarters at all. If I just sat on the unit for five years, five year lease, five year lease, I would make a significant profit by just sitting on it and letting Mark and Jimmy [Kearns and Waterman] handle my own property, just by giving it over to them, the only thing I was giving up was the vacation I had been spending with my kids and that was the decision.

Q. What was your expectation as to what you would use the money for?

A. Everything was meant towards education for the kids. The perfect timing, my son will be graduating in 1991, my first son, that that's what this five years was going to be, 1991.

Tr. II, at 39–40.

It is clear from this exchange that Plaintiffs were relying on the contractual provisions and that they did not want to share the profits and losses with Defendant Kearns and his affiliated entities on a pro rata basis. Mrs. Lavery specifically rejected any percentage-based sharing arrangement similar to the bonus found to constitute a common enterprise in *Savino*, and she was explicit in stating that she wanted the fixed returns promised by the contracts, not anything more *that would entail greater risk.*

Not only did Plaintiffs not desire or expect a common enterprise, but Mrs. Lavery's testimony on direct examination demonstrates that Defendants did not present the venture as such:

Q. For both of these units, the Inn at Goose Rocks unit number 5 and Bellevue unit number 23, and also the B 15, for the leaseback period, was there any representation to you by anybody Kearns/Waterman, Kavanagh or anybody else that said, we will only pay you these lease back payments if the real estate sales market stays good?

A. No. It made little or no difference to us, it was a 5 year, 60 month lease. *We didn't have to worry about that, that was their business.*

Q. Let's talk about the 2 units where you signed buy backs, that is the B–23 and Goose Rocks, on those two units did Kearns/Waterman or anybody working for them represent to you that, well, we're promising to buy these back from you in 5 years if the market stays good.

A. No, it was a guaranteed buy back.

Tr. II, at 47 (emphasis added). Mrs. Lavery obviously made an explicit distinction between her agreement and the risks attendant to Defendant's business.[8] Exami-

8. In their reply memorandum, Plaintiffs argue that "[t]he key focus ... is not on the form of the profit, but on the risk involved, and the

extent to which a favorable outcome is dependent upon and interwoven with the fortunes of a developer." Plaintiffs' Post-trial Reply Memo-

nation of the contracts themselves, and the understandings and representations concerning them when the transaction took place shows quite plainly that there was no vertical common enterprise between Plaintiffs and Defendant Kearns.

### B. *Horizontal Commonality*

Plaintiffs argue that this case deals with securities because the facts in this case establish the requisite horizontal common enterprise as well. They point to evidence that the rental income from all the Kearns and Waterman projects went into Atlantic Hospitality accounts for payment of expenses at all sites, that purchase proceeds were pooled to pay down a line of credit used to finance the Bellevue, and that the sales of the Bellevue units were marketed with an emphasis on the enhancement of their value as a result of the development of the Shawmut Inn. Plaintiffs also argue that the investors were clearly linked because the conversion to quarter shares needed a unanimous vote, that the leases were needed to free the units for rental by Kearns's and Waterman's companies, and the leases were made available to all of the Bellevue owners or none.

Plaintiffs have defined horizontal commonality as requiring a pooling of the interests of the investors, arguing that the nature of the pool is less important than the actual reality of whether the investors' interests are tied together through rental arrangements. There was, however, no traditional pooling of interests by Plaintiffs and other owners at the Bellevue. In *Howey* itself, the investors each bought a narrow strip of land in an orange grove and consigned the management of the land to a service company. All of the oranges from the grove were pooled and sold, and the individual strip owners received a share in the profits equal to their share in the land. *Howey*, 328 U.S. 293, 66 S.Ct. 1100, 90

L.Ed. 1244 (1946). Certainly, as demonstrated by the fixed payment leases and buybacks, the transaction in this case did not contemplate an allocated sharing of profits among the owners as in *Howey*.

In the context of a discretionary commodities trading account, admittedly a different sphere than that presented by the facts here, Justice Stevens, in an opinion as a circuit judge, declined to find horizontal commonality. He noted that "the success or failure of other [buyers'] contracts had no direct impact on the profitability of plaintiffs' contract." *Milnarik v. M–S Commodities, Inc.*, 457 F.2d 274, 276 (7th Cir.1972). While the customers might have been represented by a common agent, they were not joint participants in the same investment scheme. *Id.* Justice Stevens adopted the District Court's explanation of why the discretionary account did not create a common enterprise:

> In essence, this contract creates an agency-for-hire rather than constituting the sale of a unit of a larger enterprise. No matter how many different persons Nelson became an agent for under similar or even identical discretionary contracts, his relationship with each would remain as that of agent and principal. Each contract creating this relationship is unitary in nature and each will be a success or failure without regard to the others. Some may show a profit, some a loss, but they are independent of each other. No matter how many discretionary trading accounts Nelson may have had with other principals, the "security" "issued" to the plaintiffs, their discretionary trading account, could not be offered to anyone else.

*Id.; Curran v. Merrill Lynch, Pierce, Fenner and Smith, Inc.*, 622 F.2d 216, 222 (6th Cir.1980) (also quoting *Milnarik*). Despite the widely different context, the

---

randum, at 10 n. 12. Clearly, Plaintiffs here never contemplated assuming any risk with Kearns and Waterman. Plaintiffs rely on *SEC v. Lake Havasu Estates*, 340 F.Supp. 1318, 1322 (D.Minn.1972) for their argument that a fixed return may still depend on the success or failure of a developer's operations as a whole. The court there stated: "By virtue of the aforesaid

dependence of investors on Lake Havasu, it is clear that investors are joined in a common enterprise." *Id.* at 1322. This Court cannot accept the reasoning of the *Lake Havasu* court because it mistakenly collapsed the second and third *Howey* requirements, thus effectively eliminating the requirement of a common enterprise.

Court finds instructive similarities between the situation presented here and that presented in *Milnarik*.

Each unit purchaser here bought his or her own condominium and made a type of agency arrangement with Kearns and Waterman through one of their business entities, Atlantic Hospitality. Here, Plaintiffs point to the fact that Defendants presented the quarter share lease/buyback plan to potential customers by saying they would advertise jointly and that there would be a shuttle bus to take overflow customers from the Shawmut Inn to the Bellevue and the Inn at Goose Rocks, thus benefitting the Bellevue owners. Tr. VII, at 655. Mrs. Lavery made it clear, however, that she did not care whether the room was rented out or not because she would receive the lease payment in any event. The contractual agreement, with its insulation of Plaintiffs and other buyers from the vagaries of the trade and the fortunes of the other investors, governed the transaction.

Similarly, although the lease included an agreement that Ocean Sales would do the marketing of the quarter shares, this again was in the nature of an agency.[9] There was no common venture with other Bellevue buyers by which Plaintiffs received more profits if other owners were successful in selling their quarters or received less if the other owners or the group as a whole were unsuccessful. Each owner had his own unit, with its separate contracts with Kearns and Waterman, and each owner could make profits or sustain losses independent of the fortunes of the other purchasers.

In *Rodriguez v. Banco Central*, the court described horizontal commonality as meaning that "the fates of the investors are intertwined through the pooling of common funds to be used for the common development to benefit all. The fate of each investor must rise or fall together." *Rodriguez v. Banco Central*, 777 F.Supp. at 1058.[10] In *SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 64 S.Ct. 120, the seminal case in this field predating *Howey*, the defendant offered investors leaseholds and promised to drill an oil well located so as to test the oil producing capability of the leaseholds. The Supreme Court found that the investors had joined in a common venture to drill an oil well. Clearly, this is the type of common development to benefit all that was intended by the court in *Rodriguez*, or as the Supreme Court described it, "the thread on which everybody's beads were strung." *Joiner*, 320 U.S. at 348, 64 S.Ct. at 122.

In this case, the overwhelming thrust of the evidence is that no such common enterprise or venture existed. As the court stated in *Hart v. Pulte Homes*, 735 F.2d 1001, 1005 n. 2 (6th Cir.1984), "commonality must be essential to the venture offered by the developer." Although ultimately Kearns and Waterman did pool the receipts from both sales and rental of the units, that was not part of an initial *development* plan that included Plaintiffs and the other purchasers. In *Woodward v. Terracor*, 574 F.2d 1023 (10th Cir.1978), the Court of Appeals for the Tenth Circuit found that no common enterprise existed where Defendants sold lots in what was billed as a planned residential community to include recreational opportunity, transportation facilities, shopping centers and health and cultural facilities. As the stated:

> Terracor itself was involved in a business venture. Terracor was developing a new residential community. As part of its

9. This agency-like sales arrangement does not give rise to a vertical common enterprise any more than does the commission sales relationship of a stockbroker with his client. *See Xaphes*, 597 F.Supp. at 216. Plainly, the person or company receiving the commission can make a profit while the person for whom he is making the transactions incurs a loss.

10. In *Hocking v. Dubois*, 885 F.2d at 1459, the Court of Appeals for the Ninth Circuit described horizontal commonality in a similar fashion: "The purchase of real estate combined with a an RPA [rental pooling agreement] ... does evidence horizontal commonality. The participants pool their assets; they give up any claim to profits or losses attributable to their particular investments in return for a pro rata share of the profits of the enterprise; and they make their collective fortunes dependent on the success of a single common enterprise."

venture Terracor sold lots to persons who either intended to build a house thereon, or intended to resell to others who would so build. But the mere fact that the plaintiffs bought lots from Terracor does not mean that by such acquisition they were thereafter engaged in a common venture or enterprise with Terracor. The only contractual agreement between plaintiffs and Terracor was the Uniform Real Estate Contract. Terracor was under no contractual obligation to the plaintiffs other than to deliver title once purchase terms were met. Unlike *Howey*, Terracor was not under any collateral management contract with the purchasers of its land. In short, the record ... simply shows the purchase by plaintiffs of lots in a real estate development.

*Id.* at 1025. Although the Court in *Terracor* refers to the relationship between the developer and the investor, it is helpful in framing the inquiry for horizontal commonality because it focuses on whether the investors were offered part of a development project in which they would all jointly participate.

The Court is satisfied from all the evidence presented in this case that Kearns and Waterman may have had a plan by which they would use the capital from the Bellevue sales for their other projects. The Bellevue owners were not a part of that plan, however. Kearns and Waterman sold to purchasers like Plaintiffs who then could hold on to their property, using or renting it, or resell it. Each purchaser had a separate agreement with Defendants and they had not subscribed to any plan making themselves dependent on the success of their fellow owners' investment or on the success of either the Bellevue or all of Kearns's and Waterman's projects. Although there was a collateral management contract with the purchasers of the condominiums, it was very restricted, as explained at great length above.

Kearns clearly represented to purchasers at all the developments that he was going to develop the Shawmut Inn. The evidence does not convince the court, however, that Plaintiffs and the other purchasers at the Bellevue were jointly buying into that development in any significant sense. The promise of a joint reservation system or the possibility of overflow referrals was not the crux of the prospective value of Plaintiffs' investment. The court in *Pulte Homes*, 735 F.2d at 1005, failed to find a horizontal common enterprise when model homes were offered for sale with a lease similar to that offered Plaintiffs here. The court stated that even if individual purchasers were assured of development, "the mere fact that an assurance of development to each investor may have come from the same seller does not satisfy the requirement of horizontal commonality." *Id.* at 1004.

While Kearns and Waterman also promised to finish a health club at the Bellevue, this is similar to the situation addressed by Judge Fuste in *Rodriguez*. Relying on a decision by Justice Powell sitting in the Eleventh Circuit, *Rice v. Branigar Organization, Inc.*, 922 F.2d 788, 790–91 (11th Cir.1991), the court held that sale of undeveloped land with the promise that there would be a country club for the use of purchasers did not turn an ordinary land sales contract into an investment. *Rodriguez*, 777 F.Supp. at 1060. Similarly, the promise to purchasers to finish renovations on the individual rooms, was not a promise of significant development that would be the basis of profits for all the owners. The Court notes that the Bellevue itself was virtually fully developed when the units were sold. The sales price included improvements to the individual rooms that were in progress at the time of closing.

The Court is fully satisfied from the evidence that while Kearns and Waterman had extensive development plans for themselves, they did not incur any significant development obligations vis-a-vis the group of purchasers as a whole, and there was no agreement to engage in wide scale development through the use of common funds that would then generate a return on investment to the purchasers. *See Rodriguez*, 777 F.Supp. at 1058 (explaining *Terracor*). Mark Kearns's testimony on this point was highly credible. When asked

what he told prospective buyers about where they might realize a profit from their purchase of a unit, he replied:

> Any of these projects that we have been discussing here, the whole thrust of the investment side, the profit side to the purchase was the appreciation of the value of the property through general economic good time, so to speak, plus the fact that they were near or at the ocean.

> And then, secondly, at the Bellevue, the increased value was going to be the fact that someone could own a whole unit and could in a way, be their own developer. They could then choose to sell one unit this year, one unit next year and they could set whatever price they wished, set a high price, say I'll wait until someone comes along and purchases the quarter; they could sell some quarters and not some quarters, that was the whole thrust of how people were going to really make money at any of these projects.

Tr. VII, at 1137; *see also*, Tr. VI, 845. The "thread on which [Plaintiffs'] beads were strung" was their own ownership of a condominium on the ocean and their individual contracts with Atlantic Hospitality. The transaction was not one in which the purchasers were invited to or did provide funds that went for a common development. They purchased their own units to rent for a fixed return or to resell.

Since Plaintiffs did not enter into either a vertical or horizontal common enterprise when they purchased unit B–23 at the Bellevue, they have not shown that there was an investment contract here. Thus, the federal securities laws do not apply, *Howey*, 328 U.S. at 299, 66 S.Ct. at 1103,[11] and Plaintiffs are entitled to no relief on Counts I, II, and III.

### III. STATE SECURITIES LAWS

Plaintiffs argue that Defendants have also violated the state securities laws of Maine, New Hampshire and Massachusetts. They suggest that the test for a security is the same in those states as it is under federal law. Each state's laws define securities as including investment contracts. 32 M.R.S.A. § 10501(18); Mass. Gen.Laws Ann. ch. 110A, § 401(k); N.H.Rev.Stat.Ann. ch. 421–B:2(XX).

The Maine Law Court has asserted that it takes guidance from, but is not controlled by, federal law when construing state securities legislation. *Bahre v. Pearl*, 595 A.2d 1027, 1032 n. 5 (Me.1991). In *Bahre*, however, the Law Court relied almost exclusively on federal law in determining whether the partnership interest at issue there was a security interest. The Court sees nothing in the discussion of investment contracts in *Bahre* indicating that the Law Court would not be guided by federal law and reach the same conclusion reached by this Court if it were called upon to decide whether the sale of a condominium with a lease and buyback such as the one presented here is an investment contract.

In *Morgan v. Financial Planning Advisors*, 701 F.Supp. 923, 926 (D.Mass.1988), the United States District Court for the District of Massachusetts held specifically that the decision whether an investment in rare coins was an investment contract was the same under both federal and Massachusetts securities laws. The New Hampshire Supreme Court has also looked to *Howey* for guidance in deciding if a transaction is an investment contract. *State v. Heneault*, 121 N.H. 497, 431 A.2d 142 (1981). Under New Hampshire law the definition of an investment contract is more restrictive than that prescribed by *Howey*, requiring that investment contracts be in the form of a bill of sale in order to be regulated by state securities law. *Id.* That difference, however, would not affect the Court's decision here. Thus, as Plaintiffs' argument for the opposite result suggested, the Court's determination that the transaction here was not an investment contract under federal law precludes recovery under the securities laws of Maine,

---

**11.** Since Plaintiffs have failed to prove the second prong of the *Howey* test, there is no need to determine whether the transaction would meet the third *Howey* requirement that profits from the investment come from the efforts of others.

New Hampshire, and Massachusetts as well. Plaintiffs, therefore, are entitled to no relief on Counts V, VI, VII and VIII of their complaint.

## IV. RICO

Plaintiffs also seek treble damages under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1964(c), which provides: "Any person injured in his business or property by reason of a violation of section 1962 of this Chapter may sue ... and shall recover threefold the damages he sustains and the cost of suit, including a reasonable attorney's fee." Plaintiffs have alleged a violation of 18 U.S.C. § 1962(c), which prohibits

any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

In *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985) the Supreme Court explained that a plaintiff seeking treble damages under section 1964(c) must show "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity, and (5) that the racketeering activity caused injury to the plaintiff's business or property."

Plaintiffs argue that Defendants are liable under RICO for conducting the business of the Shawmut Inn through a pattern of racketeering activity consisting of securities fraud and mail and wire fraud.[12] It has been established above that no securities were involved here. Therefore, securities fraud cannot serve as a predicate offense for the RICO charge. Plaintiffs' theory of mail and wire fraud is that the condominium packages at the Bellevue, the Inn at Goose Rocks and the Shawmut Inn with the accompanying leases and buy-

backs were fraudulent schemes which were put together and marketed with the aid of the mails and telephone. In broad terms Plaintiffs argue that the condominium marketing was fraudulent because Plaintiffs and other buyers were told that these were guaranteed investments and were not informed that return on the investment was dependent on the ability of Kearns and Waterman, who were already heavily leveraged, to continue to receive bank financing.

In *McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc.*, 904 F.2d 786 (1st Cir. 1990), a RICO case in which the alleged predicate racketeering activities were mail and wire fraud, the Court stated:

To establish that the appellees violated the mail and/or wire fraud statutes, McEvoy must show that the appellees engaged in a scheme to defraud with the specific intent to defraud and that they used the United States mails and/or the interstate wires in furtherance of the scheme.... In *McNally v. United States*, 483 U.S. 350 [107 S.Ct. 2875, 97 L.Ed.2d 292] (1987), the Supreme Court held that to come within the compass of the mail fraud statute, the scheme to defraud must be intended to deprive another of money or property.

*Id.* at 790.[13] The Court finds that Plaintiffs have not established mail or wire fraud by a preponderance of the evidence adduced at trial.

■ Although the scope of fraud is broader under the wire and mail fraud statutes than it is under the common law, the scheme must still be intended to deceive another, by means of false or fraudulent pretenses, representations, promises, or other deceptive conduct. *Id.* at 791. To make clear what is meant by "deceive," the court in *McEvoy* cited the Webster's Dictionary definition of defraud: "to take or withhold from (one) some possession, right or interest by calculated misstatement or

---

12. RICO's definition of racketeering activity specifically includes securities fraud and mail and wire fraud. 18 U.S.C. § 1961(1)(B) and (C).

13. In *McEvoy* the court explained that *McNally* had been overruled by statute but applied to

that case since the alleged conduct occurred prior to the November 18, 1988 effective date of the statute. Similarly here the scheme to defraud is alleged to have occurred prior to November 18, 1988.

perversion of truth, trickery, or other deception." *Id.* The Court of Appeals has long recognized that specific intent for mail fraud may also be proved by showing that a defendant consciously avoided knowing the truth by not determining the accuracy of his statements. *United States v. Brien,* 617 F.2d 299 (1st Cir.1980).

■ Plaintiffs assert various affirmative misrepresentations and failures to disclose facts as having deceived them. Having had the opportunity at trial of closely observing Kearns and Waterman and the representatives of Defendant First NH Banks, and having had the opportunity to review carefully that testimony in preparation for writing this opinion, the Court cannot on the record before it find the requisite specific intent to deceive on the part of either Defendant or their agents.

The evidence presented shows Kearns and Waterman as young entrepreneurs who, like many others, were "on a roll" with the booming real estate market in Maine during the 1980s. Kearns and Waterman made extensive plans to develop property on the Maine coast, and they were very successful over a relatively lengthy period in getting financing to bring their plans to fruition. They were genuinely enthusiastic about their plans and the possibility of making lots of money in this booming area of the economy. As Kearns very credibly testified, he thought of himself as a good, astute businessman, Tr. VI, at 773–74, and he believed that "all you have to do, for example, on the Shawmut Inn is walk on the property, to see that property, those units were sold because they're on a fabulous piece of real estate." He further testified, and the Court believed him, that he thought the lease agreement "was a good deal, no question about it." Tr. VI, at 858.

At the time Plaintiffs closed on their Bellevue unit, Kearns was optimistic about his development future. He testified that he was expecting to market new units at the Shawmut within six months and to have them built in the winter of 1989–90. His estimation of his prospects was reasonable, given his past ability to put together deals. Moreover, based on financial analyses he and his accountants had done before taking on development projects at the Bellevue, the Shawmut Inn and Inn at Goose Rocks, he was sanguine about the possibility of meeting all his obligations:

> Doing the cash flow certainly gave us a comfort level that we could meet all our obligations under the leases. However, we also were reducing our debt because we were, we were taking the net proceeds of every sale and reducing our debts which was a little uncommon and many developers would say take 75 percent of the net sales proceeds of reduced debt and keep putting in their pocket the balance.
>
> We went the more conservative route and took net proceeds to reduce debt.
>
> Thirdly, we were putting what we thought at the time, tremendous value in all of the projects that we owned by getting them approved and putting the plans together. And, fourthly, we selected projects that we determined were in unique areas, and the old saying—location, location, location, we took to heart and that's why we were called the Ocean Group because all of our projects had something to do with the ocean. We believed in the ocean as really a conservative approach to development because our experience had been that properties near the ocean did not have the volatility in price that other real estate had.

Tr. VII, at 1120–21, *see also* Tr. VII, at 1112–1120.[14]

---

**14.** The Court also accepts as both reasonable and truthful the testimony of Kearns's partner, James Waterman, when he described the basis for his confidence in their projects and their ability to meet their obligations to buy back the property:

> When we first started looking at selling the chalet units, I invited in at least 3 independent real estate brokers from the Kennebunk–Ken-

nebunkport area ... to give me their opinion of what they could sell the units for. All of those ended up I believe to be higher than we were intending to market the units ourselves.

> I had been marketing real estate in the southern Maine coastal area at that point for a number of years, and my experience at the coast was that even during times when the market was extremely bad, like in early '81

Obviously, in hindsight, Waterman's and Kearns's plans and expectations proved to be unsound. The Court is fully convinced after hearing their testimony, however, that *at the time they were marketing the units at the Shawmut Inn and the Bellevue*, Kearns and Waterman planned to meet their obligations and believed that the projects were indeed "good deals" both for them *and for the unit purchasers*. The Court also finds that they had a reasonable, considered basis for their plans and beliefs. The Court, therefore, finds that there was no intent on the part of Waterman and Kearns to deceive Plaintiffs or other purchasers like them.

Plaintiffs urge the Court to find that Defendant Kearns and his agents misrepresented the Bellevue as a guaranteed investment and that these misrepresentations influenced their decision to buy the Bellevue unit. At the presentation at the Shawmut Inn, Plaintiffs were given a document describing Ocean Quarters, or quartersharing, "A UNIQUE FORM OF REAL ES-TATE OWNERSHIP AND INVEST-MENT." That document included a multi-page description of the quarter share system and a report by real estate analyst John Lane in which he presents a financial analysis of the quarter share sales plan for the Inn at Goose Rocks and the Bellevue.

■ On direct examination Mrs. Lavery testified that she relied on two specific representations in the report. First, on page 3 the report says: "The *agreement* states that the investor will have no out of pocket expenditure other than the down payment. The lease back of the unit will cover all ownership costs." (Emphasis added). Second, on page 4 the report states: "The objective is to arrive at a lease that will create a zero cash flow for the wholesale buyer during the period of ownership." The Court finds that these statements in the Lane report were not misrepresentations. They represented the intentions of Kearns and Waterman and were in fact the basis of the lease agreement signed by Plaintiffs and Atlantic Hospitality.[15] What

---

and '82, I sold real estate with mortgages as high as 21 percent.

The value of coastal property continued to go up every year, even though other things were going down or not moving forward. And I always felt the reason for that on the southern Maine coast was because that there was very limited supply and I felt it would always be an extremely high demand based on the Boston market place.

My feeling was that no matter what happened, I believed that George Bush was going to be the next president of the United States and that would have significant value on the Shawmut. And ... even if he did not there had been no other condo conversions in Kennebunkport and the zoning was such in Kennebunkport there would not be others built. So there would be a limited supply of hotel condo property ocean front in Kennebunkport.

Mark and I sat down and figured out what the buy back really meant to us. We said if these people should want to sell us and their units, they notify us 6 months in advance, I should be able to go out 2 years from now and market that unit. And if I could not market it within that 6 month period of time, I could very easily obtain financing to buy it over long enough to resell it, and also we figured those would be our least expensive units once we had the Shawmut Inn project developed, so there would always be somebody looking to be at the Shawmut Inn on the lower end of the price range so there would be no difficulty at all in reselling the units. Tr. VIII, at 1432–33.

**15.** Plaintiffs argue that Kearns knew from his projections that the projects could not carry the lease and buyback payments and therefore it was a misrepresentation to say that the deal would produce no costs to the buyer and that they were guaranteed. While Kearns and Waterman had made projections showing that the rentals would not pay for the leases in the first two years, they expected the leases to break even in the third year and be profitable to them in the fourth year. They credibly testified that they planned to pay the leases in the first two years out of rental income, other hospitality revenues, borrowed funds and savings on interest payments after other units were sold. The evidence shows that this was a reasonable expectation on the data then available to them and that there was no representation that they would pay the leases from rentals alone. Similarly, they expected the real estate market to go up and planned to fulfill their promise to buy the units back at the end of the term in the buyback agreement by offering them for sale at the agreed upon price or borrowing money to buy them themselves. When asked if he had the intention of buying the units back himself, Kearns testified "[i]f the date came, absolutely." In the context of all the evidence, the Court is persuaded that Kearns fully and reasonably intended to make the lease payments to Plaintiffs and to buy back their unit.

Plaintiffs now view as a misrepresentation is really Defendants' failure to fulfill their business expectations. As the Court explained in *Hilton Sea, Inc. v. DMR Yachts, Inc.*, 750 F.Supp. 35, 37 (D.Me.1990), failure to perform as promised without more does not constitute fraud. "If the opposite were true, then every breach of contract would present a colorable claim for fraud and perhaps a RICO violation." *Id; McEvoy*, 904 F.2d at 791.

Plaintiffs also urge the Court to find that Defendants made misrepresentations in a letter sent to them after they had decided to buy the Bellevue unit. In the letter James Kavanagh introduced and described Ocean Sales Inc., the new Waterman and Kearns entity which would market and sell their properties. The letter explained the quarter share program, which had first been presented to Plaintiffs at the Shawmut Inn a few months before, stating:

> These motel/hotel condominium units are available immediately at a wholesale investor level with management options that allow for a break-even cash flow situation plus a compounded annual rate of return guaranteed and the potential for a very substantial return on your initial investment.

PX 418A.

Although Plaintiffs urge the Court to find that the letter promised an investment that would guarantee "a very substantial return on your initial investment," close examination of the letter shows that it merely mentions a "potential" for substantial returns. The Court is satisfied that this was not a misrepresentation for Kearns and Waterman actually believed that the sales of quarter shares would generate significant returns for the whole unit buyer. Their belief was reasonable since each quarter would be sold for more than one quarter of the price of the single unit and since the concept of allowing purchasers to have a relatively low-cost coastal vacation condo home has a patent marketing appeal.

The Kavanagh letter also describes a program with a guaranteed, compounded annual rate of return. This was not a misrepresentation, however, for in fact, the buyback agreement between Plaintiffs and Kearns and Waterman provided a contractual guarantee that at the end of five years Plaintiffs could sell the Bellevue unit, recouping a certain percentage on their initial downpayment. Again, the fact that Defendants might breach the agreement because of unanticipated adverse business conditions, is not, without more, a basis for a finding of fraud. *McEvoy*, 904 F.2d at 791.

Kearns and Waterman did not disclose their financial data and the amount of their overall debt to Plaintiffs. The Court cannot find, however, that this nondisclosure amounted to an intent to deceive. Neither can the Court find that this nondisclosure was a reckless or negligent concealment from Plaintiffs of facts material to their business decisions. It is clear from the testimony at trial that real estate development is conducted by means of ever renewed financing. Borrowed money supports purchase and improvement of property, and debt service is paid through income from the property, sale of the property or through further borrowing. Ultimately, the improved property is available to pay off the debt.[16] Kearns credibly explained that he believed he had enough property to pay off his debt. Based on all the evidence presented at trial, the Court cannot find that Kearns's and Waterman's debt or their mode of operation was unusual for their type of business. Moreover, they were not unreasonable or reckless in failing to foresee their downfall.

The Court believes Kearns's explanation of the financial difficulties [17] his enterprises encountered:

---

**16.** As Kearns testified: "[T]hat's the real estate business, you buy property and try to improve it and then sell it; that's the business." Tr. VI, at 917. He also stated: "That is how I paid off my debt, selling my property." Tr. VI, at 913.

**17.** The Court declines Plaintiffs' invitation to find that Kearns and Waterman had financial difficulties as early as the fall of 1987. Although there was evidence of some cash flow shortage in that period in some of the Kearns and Waterman entities, the Court agrees with Mark Kearns's testimony that cash flow short-

[U]nfortunately, not really intentionally [we got] all our eggs in the Shawmut Inn basket. And we had put into that project all kinds of costs, all of the profits that we made anywhere else and in the end when that was not financed and was not built, that was the primary reason that it came to an end.

Tr. VII, at 1151. Based on all evidence and on Kearns's experience in the field, the Court thinks this is a reasonable assessment of what happened.[18] Obviously, once the project was not financed, Kearns and Waterman were not able to pay off the development debts already incurred because they did not have a developed property to sell or the other anticipated incomes from the developed property[19].

Kearns testified, however, and the Court was fully convinced by his testimony, that the first time he began to have any doubt about getting the Shawmut Inn financed was in August, 1988. Tr. VII, at 1162. Based on their successful performance record in obtaining loans from the Bank and the mortgage company, which continued up to and beyond the time of Plaintiffs' closing, Kearns and Waterman would not have had any reason to believe that they were in financial jeopardy before then. Moreover, the Shawmut Inn project had already passed some regulatory hurdles, and with its prime location on the water and near the vacation White House, promised to be a very profitable venture.

Although Plaintiffs have tried mightily to portray Kearns and Waterman as marginally qualified or unqualified borrowers always skating dangerously near the precipice of financial disaster, the record does not support that finding. Only very soon before the collapse of their enterprises did Kearns and Waterman ever see themselves as anything other than successful, hardworking real estate developers who were consistently able to put together intricate financing packages to support their developments. The Court is satisfied that their perceptions were reasonable and that they did not blind themselves to the financial realities of their situation. The record supports the conclusion that Kearns and Waterman were not trying to deceive Plaintiffs either by representations about the transactions or by not disclosing the inner workings of their development business.

Plaintiffs have also failed to prove that Defendant First NH Banks had a specific intent to deceive them. The initial portion of Plaintiffs' theory in that respect is that the Bank knew of and should have informed them of the precariousness of Kearns's and Waterman's enterprises. The Court is not persuaded that at the time Kearns and Waterman were marketing the Bellevue, the Bank had any qualms about their creditworthiness or thought of their situation as financially precarious.

Bank vice-president Jonathan Torrance, whose testimony was very measured and credible, testified that while Kearns and Waterman were heavily indebted to the Bank, at the time Plaintiffs bought their Bellevue unit, the Bank did not think that Kearns and Waterman were in financial difficulty.[20] Kearns and Waterman were

age is not the same as financial instability. As Kearns and Bank witnesses testified, there are slow periods in the hospitality business and then very busy periods. Kearns and Waterman anticipated their cash flow problems. For example, they knew that they would not be able to pay the leases out of the rentals initially and they were planning on using other income to pay the leases. This other income included "borrowed funds, sale of other assets, other units, whatever." Tr. VI, at 861. In fact, Kearns and Waterman were easily able to borrow a large sum of money from Granite State to cover seasonal operating losses.

18. The witnesses also testified that a more fundamental source of their difficulties was a general downturn in the real estate market. The nature of the downturn was unprecedented and neither Kearns and Waterman nor the Bank were able to predict it based on the performance of the real estate market in southern Maine up to that time.

19. Kearns and Bank witnesses credibly testified that it was common for developers to borrow significant amounts of money to develop plans and obtain needed permits before construction financing could be sought.

20. Plaintiffs have asked the Court to find that the Bank knew and did not disclose that Kearns lost money on all his projects. Plaintiffs base this sweeping assertion on testimony that oper-

current with their loan payments both to the Bank and to the mortgage company at the time of Plaintiffs' closing. It was not unusual banking practice to make commercial loans for real estate development to developers who did not have strong cash positions. Cross-collateralization and financing of the planning stages of developments were also normal. The Bank had appraisals of Kearns and Waterman properties done and relied on those as an indication of whether to make the loans, because repayment was expected to come from the developed property. Although there was an oversupply of condominiums in the Wells area, Torrance believed that the Bellevue, unlike the others, was "a fine project" because it was very close to the water and had indoor recreation facilities. Tr. VI, at 502.

The Court is fully persuaded after hearing the testimony of Mr. Torrance and Gregory Caswell, a Granite State loan officer who sat on the loan committee which approved loans to Kearns and Waterman, that the Bank hewed to its normal lending and documentation practices of the time before making the loans that it did to the pair.[21] The Bank examined the underlying collateral, project approvals already in place and evaluated the development plans. It also controlled loan renewals by ascertaining that progress on the project was proceeding apace. The Court is satisfied, too, that the Bank's judgment concerning the financial viability of Kearns and Water-

man projects and the creditworthiness of Kearns and Waterman was not unsound in any significant way. Many other banks and lending institutions participated in loans made to Kearns and Waterman, making independent judgments as to the merits of the applications before participating. The Court cannot find that the Bank was somehow hiding from Plaintiffs dark knowledge it had about Kearns and Waterman.

Plaintiffs argue that the Bank knew Kearns and Waterman would not be able to fulfill their buyback obligations if they did not receive construction financing for the Shawmut Inn, and that no such financing was in place when the buybacks were executed. Mr. Torrance very credibly testified that the Bank thought Kearns and Waterman would be able borrow money to make the buybacks because the buyback price represented an appreciation rate much lower than the actual market appreciation rate. The Bank, therefore, reasonably believed that Kearns and Waterman would be able to buy back the units if called upon to do so and had no basis for telling Plaintiffs anything to the contrary.

Plaintiffs also assert that the Bank made affirmative misrepresentations with the intent to deceive them. Specifically, they assert that at the closing, loan officer Dorothy Ward assured the Laverys of the developers' and the projects' financial viability and the Bank's full commitment to the

ating deficiencies were expected at the Shawmut Inn, the Bellevue and the Inn at Goose Rocks during the slack winter period, that the Shawmut did not achieve its projected cash flow for an eight month period in 1987, and the fact that Kearns and Waterman took a tax loss for the Shawmut Inn. Clearly, a finding that Kearns lost money on all his projects is unwarranted on this evidence. As was explained at trial, the busy months during the tourist season are expected to make up for losses during the slack winter season. Moreover, a tax loss is not necessarily the equivalent of "losing money" on a project since factors such as depreciation may be important components in arriving at a tax loss. Finally, a shortfall at one hotel for any given short period is not indicative of "losing money on all" projects in a general sense.

**21.** Plaintiffs argue that the Bank deviated from normal practice with Kearns and Waterman by,

among other things, taking a 25% fee for a letter of credit, taking remote security positions, and allowing Kearns a $150,000 unsecured loan for three days. The Court is satisfied that in the context of a relationship between the Bank and customers like these, none of these transactions was outside the pale of normal banking practice. Although Kearns and Waterman could probably have negotiated a letter of credit at a lower rate, they offered to pay the high rate to avoid having to share in profits with a partner and to be able to get the loan quickly in order to close another loan. According to Bank president, Gilbert Ross, the Bank evaluated the risk and decided to take it at that higher rate. Given that the Bank had appraisals of Kearns and Waterman properties and knew the amount of equity in properties securing other loans, they did not think it particularly risky to grant the three day unsecured loan or to take a remote security position in certain instances.

projects. Having heard both witnesses, the Court is satisfied that Mrs. Ward did tell Mrs. Lavery at the closing that the project looked like a good deal and that she was interested in it herself. The Court also believes that in response to a question or comment by Mrs. Lavery, Mrs. Ward told her that Kearns and Waterman were good customers and that the Bank would not make loans to them if it thought differently. Clearly, Mrs. Ward's comment about the purchase being a good deal was not a misrepresentation. The statement was obviously the personal opinion of Mrs. Ward, and she and her husband actually did look at a similar property to assess whether they should buy it. The comment was in no way intended to deceive Plaintiffs and no such inference can be drawn from it.

The Court also finds no misrepresentation in Ward's statement that Kearns and Waterman were good customers and that the Bank would not lend to them if they were not. All the Bank officials testified that Kearns and Waterman were good customers, and as demonstrated above, the Bank and many other banks believed their projects were worthy of financing. Therefore, Mrs. Ward merely expressed to Mrs. Lavery the Bank's policy and the undeniable fact that Kearns and Waterman were good customers who had received loans from the Bank. Neither Mrs. Ward nor the Bank had any reason to disbelieve the substance of her statement, and the Court cannot find that in making it Mrs. Ward intended to deceive Plaintiffs or was reckless or negligent about the possibility of deceiving them.

The Court does not believe that Mrs. Ward made the other statements that Mrs. Lavery has attributed to her, specifically that the Bank would insist on an escrow account for the leases, that the Laverys need not worry about the mortgage rate because the investment with the lease agreement was a sure thing and they were covered. Mrs. Ward denies having made these comments, and the Court believes her. First, Mrs. Ward was a loan officer with limited authority, and it was plain from her testimony that she had a keen sense of the restrictions imposed upon her

at closings. She repeatedly described having to clarify details with her superiors. Mrs. Ward testified that she knew nothing about an escrow account for the leases and that she did not have any escrow accounts. The Court is satisfied that if she had been asked a technical question like that, she would not have responded without seeking advice, and obviously if she had sought advice she would have said there were no escrow accounts, since there were none in fact. The Court also cannot find that a cautious, and indeed somewhat insecure, loan officer like Mrs. Ward would or did make such sweeping, inaccurate statements about liability on a mortgage at a closing or that she would attempt to explain the operation of the lease. As she testified, her role at the closing was to deal only with the Bank's mortgage. She did not see the lease and buyback agreements, did not understand them, and probably was not present at all times while they were being executed. Based on Mrs. Ward's demeanor and her explanation of and apparent understanding of her position at the Bank, the Court fully believes that she did not say that the Laverys need not worry about the mortgage payment because the lease would cover it.

Mrs. Lavery testified that she relied on a First NH Banks publication, "First Report", PX 11A, in believing that the Bank was backing Kearns and Waterman fully so that they would be able to pay the leases. The Court has carefully read "First Report" and does not believe that it makes the representations attributed to it by Plaintiffs or indeed that it makes misrepresentations about Kearns and Waterman.

The publication, clearly a public relations organ of First NH Banks, describes Kearns and Waterman and their enterprises and plans in glowing terms, establishes that they are customers of the Bank and extracts from them laudatory statements about the Bank. "First Report" makes the statement that "[i]t's Mark Kearn's [*sic*] and Jim Waterman's business to make great properties even better. And they're very good at what they do." The Court is

satisfied from the testimony at trial that the Bank, Kearns and Waterman, and Plaintiffs all thought that the Kearns and Waterman had excellent properties in the Shawmut Inn, the Bellevue, and the Inn at Goose Rocks, and that as Kearns testified, their job was to improve the properties. The evidence shows that in fact they did improve the Bellevue and the Inn at Goose Rocks significantly. Mrs. Lavery even wrote a letter to Waterman complimenting him on his exquisite taste, attention to detail, and the highly appealing atmosphere of the Inn at Goose Rocks. DX 34MM. Thus, it would not have been a misrepresentation at the time of the "First Report" to say that Kearns and Waterman were good at improving properties.

Much of the first page of the article describes Kearns's and Waterman's plans for the Shawmut Inn. The "First Report" characterizes Kearns and Waterman as "astute businessmen" and a "dynamic duo" who are "well on their way to becoming winners in this high stakes game." At the time "First Report" was issued, these statements were not misrepresentations. In April of 1988, Kearns and Waterman had made elaborate plans for major developments, they had carried some of the developments, like the Bellevue, virtually to fruition, and they had overcome some of the regulatory hurdles for the proposed development of the Shawmut Inn. Tr. VI, at 923. With their philosophy of developing oceanfront properties which had had a proven ability to maintain excellent value, and with their plan to capitalize on the possibility of having the vacation White House very nearby, Kearns and Waterman realistically appeared to be astute business-

men who were well on their way to becoming "winners".

Given the development climate, or perhaps frenzy, of the 1980's, the Bank was not misrepresenting Kearns and Waterman in the "First Report". Moreover, even if they were not "astute businessmen," the Bank perceived them to be such, finding their plans to be credible and deserving of the loans they were given. As Gilbert Ross, President of Granite State, testified, referring to Kearns or Waterman: "I spoke well of him. I thought he had good ability to generate money. I thought they had good projects, good locations, obviously I did because we were lending them a lot of money at the time." Tr. VII, at 1062–63.[22]

The Court does not find that the "First Report" contains any statement or supports any reasonable inference that the Bank was backing Kearns and Waterman one hundred percent such that Kearns and Waterman's obligations or performance were *guaranteed* by the Bank. Mrs. Lavery pointed to that portion of the article discussing financing of the purchase of the Shawmut Inn which quotes Waterman:

I called Gill Ross, ... with whom I have worked many times before. Jonathan Torrance, Senior Vice President of Granite State, brought us over to First NH Mortgage Corp. in Manchester because the transaction was so large. After reviewing our package, they said, "We'll give it top priority so you can close on time."

Neither the fact that Waterman had worked with Ross many times before or the fact that Torrance referred the loan out because of the size of the transaction indi-

---

**22.** Plaintiffs tried to demonstrate at trial that Mr. Ross did not think Kearns and Waterman were good businessmen because they had paid more than he thought they should when they bought the Inn at Goose Rocks in October 1987. Although Mr. Ross initially thought they might have been able to purchase the property for less than they had to pay, appraisals showed that the property was worth more than they had paid. The Court does not believe that during the time the Laverys were negotiating and purchasing their Bellevue unit that Ross had a poor opinion of Kearns's and Waterman's abilities because of

their handling of the Goose Rocks purchase. The Court notes too that it does not believe Mrs. Lavery's testimony that Mr. Ross "lost it" at a work out meeting with them and was railing about Kearns's and Waterman's purchase of the Inn at Goose Rocks. Mr. Caswell, who was present at the meeting and has little interest in the outcome of this suit, testified that Ross did not lose his temper and yell at the meeting. Moreover, the Court finds it unlikely that an experienced bank president would be as indiscreet about the affairs of other customers as Mrs. Lavery has described.

cates any commitment by the Bank of the type described by Mrs. Lavery.

Moreover, the final statement, that the Bank said it would give top priority to the loan transaction *"after reviewing our package"* indicates that indeed Kearns and Waterman, like other Bank customers, were subject to the Bank's review on a case by case basis when they made loan applications. In fact, on cross-examination Mrs. Lavery was asked what she meant when she said that because the Bank was "Jimmy's [Waterman's] bank" she inferred that the Bank was backing Kearns and Waterman. She testified that she did not "mean to imply they could get whatever they wanted from those banks by walking in an saying we have a project, gee, we have Mrs. Lavery here, and the bank would do whatever they wanted." Rather she testified:

> I believe they had to have certain, do certain customary things like everybody does, loan application and investigations and credit checks, that is what you do with the bank. I assumed that is what Jimmy was doing, this was the bank he was using. I assumed he was a customer like I was a customer, I'm not saying that he could go in and say I need a loan.

The "First Report" does not affirmatively or by omission make representations or misrepresentations about Kearns and Waterman and the Bank's relationship to them, by which it intended to deceive Plaintiffs or others. The Bank could not have foreseen that Plaintiffs would make the mistaken inferences they did from this public relations piece.

The Court does not, by this analysis express any admiration for the business judgments of Kearns and Waterman or of the Bank, or for that matter of Plaintiffs, all of whom were, in one way or another, swept up in the development mania of the 1980's. The record makes clear, however, that the economic climate for real estate development on the southern coast of Maine changed drastically in the period under consideration here. As these events were unfolding, Defendants did not think, and they had no significant reason to think that rapid expansion would not continue. What turns out to be bad business practice is not necessarily fraud when it occurs. Plaintiffs have not proved by a preponderance of the evidence that either Defendant had the intent to deceive them that is a necessary element of the offenses of mail and wire fraud.[23]

---

**23.** Because the Court found that the transaction entered into by Plaintiffs is not a security, it need not determine whether Defendants engaged in fraudulent conduct within the meaning of the Securities Acts. It is plain, however, that the evidence would not support such a finding because the requisite intent to deceive, or *scienter* is not present.

In *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), the Supreme Court defined the *scienter* requirement in securities fraud actions as intent to deceive, manipulate, or defraud. While holding specifically that negligent conduct by a defendant is not enough to support a claim of securities fraud, the Court left open whether reckless conduct would be sufficient. Subsequently, most of the circuit courts of appeals and this Court have held that *scienter* may be established by proof of recklessness. *Xaphes v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 600 F.Supp. 692 (D.Me. 1985). The Court of Appeals for the First Circuit has assumed the applicability of a recklessness standard, *Cook v. Avien, Inc.*, 573 F.2d 685 (1st Cir.1978), and appears likely to so hold when the issue is squarely presented. As this Court explained in *Xaphes*, "to act 'recklessly' is

to act 'in disregard of a risk so obvious' that the actor 'must be taken to have been aware of it and so great as to make it highly probable that harm would follow.'" *Xaphes*, 600 F.Supp. at 694 (*quoting* W. Prosser, *The Law of Torts*, at 85 (4th ed. 1971)).

In this case, as should be clear from the analysis of the evidence in the text, the Court does not believe that Defendants either had a specific intent to deceive Plaintiffs or that they were reckless as to the danger of misleading them. Kearns's and Waterman's prior performance, the nature of their properties, and the general economic climate were such that Defendants did not and could not have known at the time the transaction was negotiated and consummated that the many Kearns and Waterman enterprises would fail and that ultimately Plaintiffs' investment would also fail. Kearns and Waterman and the Bank, in those heady days of expanding real estate development, reasonably thought that financing would be available for the Shawmut Inn project. And as Kearns testified, it was the inability to finance that project and the unpredictable downturn in the real estate market that caused all their financial difficulties.

Since the Plaintiffs have not proved racketeering conduct, they have not proved a RICO violation under 18 U.S.C. § 1962(c), and they are not entitled to recover under 18 U.S.C. § 1964.

## V. FRAUD

█ In Count IX Plaintiffs seek relief from both Defendants on a theory of common law fraud. Under Maine law [24]

[a] defendant is liable for fraud if he (1) makes a false representation (2) of a material fact (3) with knowledge of its falsity or in reckless disregard of whether it was true or false (4) for the purpose of inducing another to act in reliance upon it and (5) the plaintiff justifiably relies upon the representation as true and acts upon it to his damage.

*Arbour v. Hazelton*, 534 A.2d 1303, 1305 (Me.1987). Each of the elements of fraud must be proved by clear and convincing evidence. *Horner v. Flynn*, 334 A.2d 194, 200 (Me.1975) *overruled on other grounds* by *Taylor v. Commissioner of Mental Health and Mental Retardation*, 481 A.2d 139 (Me.1984). Thus, the proof must be such as to lead the trier of fact to find that the existence of a contested fact is highly probable rather than just more likely than not. *Taylor*, 481 A.2d at 153.

As has been demonstrated above, Plaintiffs have not proved for purposes of their civil RICO claim that Defendants made any false representations or omissions which they knew to be false or made in reckless disregard for whether they were false. Since Plaintiff's evidence could not meet the lesser preponderance of the evidence standard applied in determining the existence of mail fraud for purposes of civil RICO, it would also fail in establishing fraud under Maine's heightened evidentiary standard. Plaintiffs are, therefore, entitled to no relief on Count IX.

## VI. NEGLIGENT MISREPRESENTATION

Maine law provides that

one who, in the course of his business, profession, or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence, in obtaining or communicating information.

*Chapman v. Rideout*, 568 A.2d 829, 830 (Me.1990). Plaintiffs argue that "the same evidence which supports a finding of fraud against these defendants also supports a finding that, at the least, Kearns and the Bank failed to exercise reasonable care in making representations (or failing to provide information) and should be found liable in negligence to the Plaintiffs." Plaintiffs' Post–Trial Brief, at 37. The Court has already resolved this issue in its discussion of the RICO count, finding both that Plaintiffs did not adequately prove false or misleading representations or omissions were made by Defendants and that Defendants were not unreasonable in holding the beliefs underlying the representations and omissions they did make. Plaintiffs, therefore, are not entitled to relief on Count X.

## VII. BREACH OF CONTRACT

Mark Kearns, through his entity, Atlantic Hospitality, had a lease agreement with Plaintiffs for unit B–23 at the Bellevue to pay them $463.18 per month for sixty months beginning on May 8, 1988, unless the lease was terminated by Plaintiffs or by sale of quarter shares. Kearns had a similar lease agreement for unit B–15 at the Bellevue, providing for monthly lease payments of $456.56. Atlantic Hospitality breached the agreements in November 1988 by defaulting on the lease payments for both units. Plaintiffs later discovered that Atlantic Hospitality had not made certain tax and insurance payments that were part of its obligations under the lease

---

**24.** Defendants argue persuasively that Maine law should apply both to Plaintiffs' tort and contract claims. *See e.g., Baybutt Construction Corp.*, 455 A.2d at 918; *Beaulieu v. Beaulieu*, 265

A.2d 610 (Me.1970). Plaintiffs' have not briefed the issue but assuming Maine law applies, have based their arguments upon it. The Court agrees that Maine law governs here.

agreement, and Plaintiffs were required to and did pay them.

After a tumultuous meeting in February, 1989, Bellevue owners ousted Atlantic Hospitality and retained other management. Plaintiffs signed a management contract with Garnsey Brothers beginning in March 1989. Although repeatedly requested to do so, Plaintiffs never signed a lease termination agreement. Although Mrs. Lavery's testimony on the point was somewhat confusing, see Tr. III, at 166, Tr. IX, at 1549–52, and Mr. Kearns's cross-examination of her on the point was even more obscure, the Court believes Mrs. Lavery's testimony that Plaintiffs are owed $14,-759.29 for their unpaid rents and out-of-pocket expenditures that were supposed to have been paid by Kearns and Waterman.

█ Although Kearns apparently was trying to make the point on cross-examination that only four months' unpaid rents are owed, the Court rejects that conclusion.[25] The Court finds that Plaintiffs attempted to mitigate their damages by employing Garnsey Brothers to manage their units for them when Atlantic Hospitality had made it clear that it could no longer live up to its contractual commitments and breached the lease itself.

█ Plaintiffs also seek damages from Kearns for breach of the buyback agreement. They first argue that Kearns is obligated under the terms of the contract to buy the property on or before April 8, 1988, and that he has testified that he is unable to buy it back now. Although the contract used that language, as explained in footnote 5, the language was ambiguous and the intent of the parties was clearly that the buyback would take place in April 1993, not sooner. Under Maine law, if a party has repudiated an agreement, the other party need not tender performance in order to sue for breach since tender would be futile. Terwilliger v. Gabriele, 454 A.2d 345 (Me.1983); Dehahn v. Innes, 356

A.2d 711, 719 (Me.1976). The record here, however, is devoid of any repudiation of the contract by Kearns. He testified expressly that he deems himself bound by the agreement. Since the time for performance of Kearns's obligation has not arrived and he has not repudiated the agreement in any sense, the Court finds that he has not breached the buyback agreement.

## VIII. BREACH OF FIDUCIARY DUTY

Under Maine law the salient elements of a confidential or fiduciary relationship are "the actual placing of trust and confidence in fact by one party in another and a great disparity of position and influence between the parties to the relation." Ruebsamen v. Maddocks, 340 A.2d 31 (Me.1975). Although the Court of Appeals for the First Circuit has indicated that it would decline under Maine law to exclude per se the bank/customer relation from the category of confidential relations, Reid v. Key Bank, 821 F.2d 9, 17 (1st Cir.1987), it has looked, in determining whether such a relationship exists, for facts showing "a relationship beyond the ordinary bank/customer situation...."

█ Here, the evidence does not adequately show that First NH Banks and Plaintiffs had anything more than an ordinary bank/customer relationship. Prior to the closing, Plaintiffs had had no dealings with First NH Banks other than signing the mortgage application, which was subsequently forwarded to the Bank. The Bank did not send Plaintiffs its "First Report." They were merely exposed to it in a public place. The Court cannot find the requisite relationship on these facts. Moreover, the Court does not believe Mrs. Lavery's testimony that Plaintiffs were holding in abeyance their decision to buy the condominiums until the time of closing when they could receive advice from the Bank. Plaintiffs had decided to buy the condominiums in November and had signed a purchase

---

**25.** Kearns has chosen to rely on the written presentations of Defendant First NH Banks, which was not subject to the breach of contract claim. The Bank did not make an argument or submit findings concerning Kearns's and Water-

man's liability on the leases, and Kearns has not done so independently. The Court, therefore, rejects the argument that it inferred from the cross-examination and deems any other argument on the point waived.

and sale agreement long before the closing or even seeing the "First Report". If Plaintiffs were actually placing trust in the Bank, they would likely have initiated contact with the Bank sooner and would have made inquiry prior to the closing.

The Court also finds that Plaintiffs were not of diminished emotional or physical capacity and that there was not a great disparity of position requiring a finding of a confidential relationship. Plaintiffs had purchased not only their home, but two other condominiums, before entering into this transaction. Moreover, Mrs. Lavery testified that she prepared a list of questions prior to the closing which she wanted the Bank to answer. *See id.*

While the Court finds that there was more of a relationship between Kearns and Waterman and Plaintiffs than between the Bank and Plaintiffs, the evidence does not support the finding that the relationship was anything more than a cordial, arms-length business relationship. Particularly lacking in the relationship is the disparity of position and influence between the Laverys and Kearns and Waterman. The Laverys had purchased other condominiums from Kearns and Waterman and others, and they had negotiated with Kearns and Waterman for a unit at the Shawmut Inn in the spring of 1987, ultimately deciding not to go forward with the purchase.

If the Court had found a confidential relationship between Plaintiffs and either Defendant, equity would raise a presumption of undue influence, and that Defendant would have to show that it had not abused Plaintiffs' confidence by using its position or influence to obtain an advantage at their expense. *Eldridge v. May,* 129 Me. 112, 116, 150 A. 378 (1930). Here to establish breach of fiduciary duty, Plaintiffs rely on the same alleged misrepresentations and omissions to disclose that they have relied on to establish previous theories. As the Court has previously found, some of the alleged misrepresentations, like those attributed to Dorothy Ward, were not made. Others like the alleged misrepresentations in the "First Report" and Lane report were not misrepresenta-

tions. The Court has also found that at the time of the negotiation and closing of Plaintiffs' transaction, Kearns and Waterman were not in a precarious financial situation and neither they nor the Bank reasonably expected them to have difficulty meeting their obligations. Obviously, therefore, failure to disclose these alleged facts would not have been a breach of a confidential relationship. Plaintiffs, therefore, are entitled to no recovery on Count XII.

## IX. COUNTERCLAIM

Defendant Bank proved at trial that Plaintiffs had defaulted on their mortgage payments in November 1989. The parties stipulated that Plaintiffs owe the Bank $172,000 in principal, interest and legal fees on the note and mortgage as of the completion of trial. None of Plaintiffs' arguments concerning securities violations or fraud have persuaded the Court that it should rescind the Plaintiffs' mortgage and note for the Bellevue unit. Plaintiffs are, therefore, liable to Defendant First NH Banks on its counterclaim in the amount stipulated.

## X.

Accordingly, it is hereby ADJUDGED that Plaintiffs are entitled to no relief on Counts I, II, III, IV, V, VI, VII, VIII, IX, X, XII, and the portion of Count XI seeking relief for breach of the buyback agreement and ORDERED that judgment enter in favor of Defendants thereon. It is FURTHER ADJUDGED that Defendant Kearns is liable to Plaintiffs on that portion of Count XI seeking relief for breach of the lease agreements for units B–23 and B–15 at the Bellevue in the amount of $14,759.29 and ORDERED that judgment enter in favor of Plaintiffs against Defendant Kearns in that amount plus interest and costs attributable to that claim. Finally, it is ADJUDGED that Plaintiffs are liable to Defendant First NH Banks on the counterclaim in the amount of $172,000 as of the end of trial. Defendant First NH Banks is hereby ORDERED to submit within five (5)

days hereof a proposed updated judgment for the Court's consideration.

SO ORDERED.