SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

**Ellis DEYON, et al., Defendants.**

Civ. No. 95–164–B.

United States District Court,
D. Maine.

Aug. 27, 1997.

---

512

David E. Marder, Celia Moore, S.E.C., Boston, MA, for Plaintiff.

Paul W. Chaiken, Rudman & Winchell, Bangor, ME, for Defendant Gullett.

Lewellyn R. Michaud, Law Offices of Lewellyn R. Michaud, Bangor, ME, for Defendant Craig.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

BRODY, District Judge.

Plaintiff, the Securities and Exchange Commission ("SEC"), alleged in a Complaint dated July 25, 1995, that Defendants, Ellis Deyon, Bradley Gullett, Sherwood Craig, William Hanke, and Dove Investment Group, Inc., violated Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a), Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 thereunder, 17 C.F.R. § 240.10b–5, and Section 15(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78o(a). After Deyon settled with the SEC, the Court issued a judgment by consent against him on January 14, 1997. The Court enjoined Deyon from committing further violations of the securities laws and ordered him to disgorge $512,000 of his ill-gotten gains. After $407,071.89 had been deposited into the Registry of the Court, the remainder was waived due to Deyon's inability to pay. The Court issued judgments against Hanke and his corporation, Dove In-

vestment Group, Inc., on October 9, 1996, and November 2, 1995, respectively, after they defaulted.[1]

A trial was held before the Court from July 28, 1997, through August 1, 1997, to determine the liability of the remaining Defendants, Craig and Gullett, and to assess penalties to be levied against them, if any.

## I. Findings of Fact

### A. Background

In the early 1990s, Bradley Gullett was introduced to a minister named William McKnight, who claimed expertise in finance including a background of having earned nine doctorate degrees. McKnight later introduced Gullett to Ellis Deyon, who was working at the time for the Charter Trading Corporation, which, according to McKnight and Deyon, had as employees agents of the Central Intelligence Agency.

In 1993, Gullett, McKnight, and Deyon executed a joint venture agreement with Atlas Langford, an elderly and affluent long time friend of Gullett's from Tennessee. Pursuant to the agreement, Langford would pay the other parties' expenses while they marketed "Prime Bank" programs. These programs in reality were fraudulent schemes that purported to generate substantial profits through the trading of fictional instruments in a fictional market said to be regulated by a "Grand Master." The parties agreed to split the profits generated by the programs. Gullett persuaded Langford to execute the agreement by falsely depicting Langford's potential profits as being in the hundreds of millions of dollars. Gullett, knowing Langford to be a devoutly religious Christian, also purported to share his religious beliefs and told him that a prophet named Bernard Leuschner told Gullett that Gullett was the "right man on the East Coast to fulfill the finances before the last harvest of Christ before the end time." Gullett also performed faith healing services in the presence of Langford.

In June 1993, pursuant to the joint venture agreement, Gullett and Deyon sought investors for a "bill of exchange" program. In advertising this program to potential investors, Gullett promised that he was to receive a pre-approved loan of five billion dollars that was "self-liquidating," indicating, he claimed, that he did not have to pay it back. Gullett told potential participants that he would use the money to buy and sell Prime Bank Debentures, which, unknown to the investors, did not exist.

An additional program executed pursuant to the joint venture agreement was known as the "Hong Kong program." In furtherance of this scheme, Langford paid for Gullett's expenses while he supposedly trained in Hong Kong with the Grand Master. Langford was told that he could expect to receive $730 million in profits from this program.[2]

Another investment scheme Deyon and Gullett executed before they began working on the bank program that is the subject of this suit was an arrangement with an individual named Ivan Pearson. Pursuant to this scheme, Pearson would use investors' money to trade bank debentures for a profit of 25% per month. Gullett, Deyon, and Pearson agreed to split the profits. Deyon assured Gullett that Pearson was trustworthy, and continued to do so even after Pearson had been named as a defendant in a twelve-count court proceeding, ultimately resulting in Pearson's incarceration.

### B. The Mexican Bank Account

In April 1995, Deyon was living and working in Mexico in an effort to initiate additional Prime Bank schemes pursuant to the joint venture agreement with McKnight, Gullett, and Langford. On April 25, 1995, Deyon opened a bank account at a branch of Bancomer, S.A. in Saltillo, Mexico, with money

---

1. The Court left the assessment of penalties against Hanke and Dove Investment Group, Inc. for determination at a hearing scheduled for July 31, 1997. Hanke did not appear for the hearing. The Court assesses penalties against Hanke and Dove Investment Group, Inc. based on Plaintiff's request for judgment and supporting documents.

2. McKnight purportedly told Gullett that President Clinton was an investor in the program; and later told Gullett that the program failed because President Clinton was refused his billion dollar share and subsequently sent the Secret Service to execute the Grand Master.

sent to him by Gullett. Deyon sent a copy of the contract opening the account to Gullett, who, despite the fact that he did not speak Spanish, never had the contract, which was written in Spanish, translated.

According to Deyon, the account paid an interest rate of approximately 85% per month and would guarantee a return of 25% per month to any investor who deposited a minimum of $25,000 and agreed to leave the money in the account for at least one year. Gullett began seeking investors for this account, telling them, in addition to the alleged terms of the account, that the account was not available to the general public and that Deyon had procured it only because he had certain high level connections in the bank. Gullett also told potential investors that the investment was as safe as any savings account in the United States and that the only risk they faced was if the bank collapsed, which he said was highly unlikely because the bank was supported by the Mexican government. Additionally, Gullett told potential investors that he had spoken with other investors who were prepared to invest $500 million in the account and that Gullett himself had invested in the account.

In an effort to prove that the Bancomer bank account truly offered the terms that he had been reporting, Gullett planned to travel to Mexico with two potential investors so they could determine the account's legitimacy for themselves. At about this time Gullett enlisted William Hanke, whom Gullett had met in early 1995 and knew had been involved in fraudulent "roll programs" in the past. Hanke thereafter called Sherwood Craig.[3] He discussed the bank account with Craig, describing it as being risk-free. Craig, who was a licensed broker for the firm of Waddell & Reed from approximately 1964 to 1968, thought that the rates Hanke said the bank offered were "too good to be true." Hanke assured Craig that the rates were correct, and explained that the bank could

afford to offer such high rates because it made 200% per month on its money. Craig admitted being pessimistic about the account. Nevertheless, he continued to discuss the account with Hanke, despite knowing that the Mexican banking industry was in the middle of the worst financial crisis in its history and that the peso had devalued approximately 50% in the previous five months.

Hanke finally told Craig that if Craig brought investors into the program and the investors agreed to accept a return of 15% per month, Craig would be entitled to recover the difference between the 25% return the account allegedly promised investors and the 15% the investors agreed to accept.[4] Gullett later confirmed this arrangement during a meeting in Florida between Craig, Hanke, and Gullett on May 9, 1995. Additionally, Gullett explained to Craig that the bank could afford to offer an account that had a return of 85% per month because it was a "World Bank." Craig did not know what a "World Bank" was nor did he make any inquiry to learn about it or to determine if Bancomer indeed was a "World Bank." Gullett also told Craig that Deyon was once employed by the Central Intelligence Agency and that Gullett had discussions with a potential investor, whose name he did not disclose, who was prepared to invest $500 million into the account. Craig did not ask for the name of the investor or make any further inquiries.

The next day, May 10, 1995, Gullett traveled to Florida with two potential investors from Pennsylvania, and on May 11 they went to the bank with Deyon and his lawyer. Gullett and the investors could not read, speak, or understand Spanish. The bank employees with whom they met could not read, speak, or understand English. Deyon's lawyer, Yolanda Cortes, translated their conversations. Although the bank employees stated that the current interest rate paid by

---

**3.** Hanke had first talked to Craig earlier in the year after learning that Craig was interested in making money to help build television stations. Craig, president and pastor of Craig Ministries, Inc., was also a televangelist who already owned and operated eight television stations under the business name Door of Faith, a Pentecostal Char-

ismatic Church comprised of fundamentalist Christians.

**4.** Gullett expected to recover for himself the difference between the 85% per month return the account offered and the 25% per month interest the investor and Craig received.

the bank was 85% per year, the two potential investors thought that the employees had confirmed Deyon's statement that the account paid 85% per month. Gullett, however, indicated that based on representations made to him by bank employees the account rate could fluctuate to as low as 55% per month. Based on Gullett's representations, and upon visiting the bank in Mexico, the two individuals from Pennsylvania decided to wire money to the bank and invest in the account.

Gullett and Craig continued to present the program to potential investors. Soon after returning from Mexico, Gullett talked to Terry Nelson, a Christian missionary, describing the account as he had done to the Pennsylvania investors although Gullett did not tell Nelson that the account could produce a rate as low as 55% per month. Nelson eventually invested in the account. For his part, Craig prepared an advertising circular that he distributed to potential investors. They described the bank as being "one of the top 200 World Banks," and that the program had been started by Christian men for church related programs. Craig faxed the circular to Hanke, who reviewed it with Gullett and faxed back a revised version to Craig. The revised version of the circular described the bank as being "supported by 25 top Prime Banks world wide...." Craig showed this revised circular to potential investors, despite the fact that he did not understand what it meant to be a "Prime Bank."

Craig continued to recommend the bank account to many potential investors, either by telephone or in person, and often provided them with documents relating to the program, including the informational circular. He told them that the bank could afford to offer such a high rate of return because it was making 200% per month on its own money. He told one potential investor, John Przybycien, that investors had placed one billion dollars into the account on the first day it was offered.

Gullett never checked with any regulatory agencies about the program and, other than his meeting with the two bank employees in Mexico, relied on information about the bank provided by Deyon. He never investigated Deyon's background and relied on McKnight who vouched for Deyon's credibility. Whenever Gullett asked Deyon for a statement for an investor, Deyon offered an excuse as to why he could not produce one. Deyon eventually sent a statement but it was illegible. Gullett never received a legal bank statement from Deyon.

Craig relied on Hanke's and Gullett's representations about the bank account. He never investigated their backgrounds, never contacted the bank himself, and never made any effort to determine if the documents he had been given were genuine. After Gullett learned that the SEC was investigating the bank account and its promoters, he told Craig that his lawyer advised him that the program could be considered a security. Craig continued to accept funds for the program. In fact, Craig continued to promote the account even after he had been subpoenaed by the SEC regarding the bank account and had invoked his Fifth Amendment right against self-incrimination.

Despite what Gullett and Craig had told potential investors, the bank account was not available only to a handful of people; rather, the account was available to the general public. Moreover, the account did not pay an interest rate of 85% per month; it evidently paid 40%–57% per year. There were no investors who had deposited $500 million or $1 billion into the account. The bank did not earn 200% per month on its money, nor would it be possible for it to do so. Bancomer is not a member of the World Bank. The account was not essentially risk-free. The factual scenario of the entire scheme was bizarre and incredulous.

## II. Conclusions of Law

### A. Securities Violations

It is unlawful under Section 17(a) of the Securities Act of 1933 for any person in the sale or offering of securities and through the use of communication in interstate commerce:

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements

made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a). Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful for any person, through the use of interstate commerce or the mails:

(b) [t]o use or employ, in connection with the purchase or sale of any security . . ., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate. . . .

15 U.S.C. § 78j(b). Rule 10b–5, codified by the SEC pursuant to the authority given it in Section 10(b) of the Securities Exchange Act of 1934, proscribes the making of any untrue statements of material fact in connection with the sale of securities. *See* 17 C.F.R. § 240.10b–5.

 A statement is material if there is a substantial likelihood that a reasonable investor would consider it important in deciding whether or not to invest his or money in a particular security. *See Basic Inc. v. Levinson,* 485 U.S. 224, 231–32, 108 S.Ct. 978, 983–84, 99 L.Ed.2d 194 (1988). A showing of scienter is required to prove a violation of Section 17(a)(1) of the Securities Act of 1933 and Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 thereunder. *See Aaron v. SEC,* 446 U.S. 680, 691, 100 S.Ct. 1945, 1952–53, 64 L.Ed.2d 611 (1980). Scienter, however, is not an element of a violation under Sections 17(a)(2) or 17(a)(3). *See id.* at 695–96, 100 S.Ct. at 1955–56. A showing that an individual acted with recklessness satisfies the scienter requirement. *See Xaphes v. Merrill, Lynch, Pierce, Fenner and Smith, Inc.,* 600 F.Supp. 692, 694 (D.Me.1985). An individual acts recklessly if he disregards a risk so obvious that he must be said to have been aware of it and a risk so great that harm would most likely follow. *Id.* A security is defined as an "investment contract." *See* 15 U.S.C. § 77b(1), § 78c(a)(10). In *SEC v. W.J. Howey Co.,* 328 U.S. 293, 298–99, 66 S.Ct. 1100, 1102–03,

90 L.Ed. 1244 (1946), the Supreme Court defined an investment contract as "any contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third person." Courts should look at the economic reality of the investment when deciding whether it can be considered an investment contract. *See United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 848, 95 S.Ct. 2051, 2058–59, 44 L.Ed.2d 621 (1975).

 The first issue the Court addresses is whether the Bancomer bank account program that Defendants promoted was a security. There is no question that certain individuals invested their money in the account and that they expected to recover profits solely from the efforts of Defendants. Nevertheless, the program cannot be considered an investment contract, and thus a security, unless there was a common enterprise. *See W.J. Howey Co.,* 328 U.S. at 298–99, 66 S.Ct. at 1102–03. A common enterprise is proven by demonstrating that there was horizontal or vertical commonality. Horizontal commonality is defined as "the pooling of assets from two or more investors into a single investment fund, usually combined with a pro rata sharing of profits." *Lavery v. Kearns,* 792 F.Supp. 847, 851 (D.Me.1992). Vertical commonality is established when "the investment manager's fortunes rise and fall with those of the investor." *Id.* The First Circuit has not yet determined which type of commonality need be present to prove the existence of a common enterprise. For present purposes, however, it is not necessary to decide which type of commonality need be present because the SEC has established the existence of both horizontal and vertical commonality.

Horizontal commonality was present because the investors' money was deposited into a single account (under Deyon's name), with each investor to receive 15% or 25% of the principal that he deposited. Thus, a pro rata sharing of the profits was present because each investor would recover an amount in proportion to the principal that he deposited; likewise, each investor would suffer a pro rata loss if the account failed to produce the

interest rate that was promised to him at the time he invested. Vertical commonality was present because the fortunes of both the investors and the Defendant promoters were linked. Gullett would recover as profit the difference in interest between what the bank produced per month and what each investor received per month. Thus, the more an investor deposited in the account, the more Gullet would recover. Similarly, Craig would recover as profit the difference in interest between the 25% per month the account supposedly offered investors and the 15% that certain investors agreed to recover. Craig, therefore, also stood to gain more in profit if an investor would deposit more money into the account. Thus, vertical commonality exists.

Defendants argue that because the interest investors could receive was capped at 25%, the investors were promised a set rate of return and thus could not share any risk of loss with the Defendants. Indeed, in *Lavery v. Kearns*, 792 F.Supp. 847 (D.Me.1992), the court held that there was not vertical commonality because the plaintiffs received exactly $416.18 per month. This rate did not vary or depend on any other factors and thus the plaintiffs did not face any risk of loss. On the contrary, the investors here faced the possibility that the interest the bank offered could fall significantly and imperil the investors' ability to recover an interest rate of 15% or 25% per month. Gullett and Craig, consequently, also could be left without any profits. Accordingly, although the investors could receive a maximum of 25% in interest per month, it was possible that they could recover less than that depending on the financial stability of the market. The Court is not persuaded by Defendants' arguments to the contrary and holds that vertical commonality was present. Consequently, the Bancomer bank program offered by Defendants was a security as that term is defined in the Securities Act of 1933 and the Securities Exchange Act of 1934.

The Court is also persuaded that Gullett, and Craig to a somewhat lesser extent, made material misrepresentations, either recklessly or with scienter, with regard to the sale of these securities. For instance,

Gullett knew as early as May 10, 1995, that the Bancomer account could earn as little as 55% per month, yet he continued to distribute circulars and other materials containing the 85% rate to potential investors. This information was material, *See Basic Inc. v. Levinson*, 485 U.S. 224, 231, 108 S.Ct. 978, 983, 99 L.Ed.2d 194 (1988), because a reasonable investor would want to know that the account's rate could drop by as much as thirty percent from what it was supposed to produce. Such a decline could foretell even further declines, which would threaten the investor's ability to recover the 15% or 25% interest he expected to receive. Gullett also knew that there were no other investors who had placed or were considering placing $500 million into the account; nevertheless, he told potential investors that this money was or would soon be deposited into the account. This, too, was material because it undermines the legitimacy of the account that Gullett had tried to establish.

Moreover, even assuming that Gullett believed that the bank produced a return of 85% per month, he was at least reckless in reaching such a conclusion. A return of 85% per month is inconceivable on its face. Gullett also was reckless in relying so much on the advice of McKnight and Deyon. For instance, he never investigated Deyon's background other than to rely on McKnight's assurance of his credibility. Gullett should have at least questioned McKnight's background based on claims of having earned nine doctorate degrees and the absurd statement that President Clinton sent the Secret Service to assassinate the "Grand Master." Clearly McKnight was not an individual upon whom Gullett should have relied for advice. Indeed, it was reckless for Gullett to have done so. Finally, Gullett should have known that the account was a fraud because he never received a legal bank statement of an investor's account after requesting several from Deyon. Gullett also never had the contract opening the account translated and he did not speak, read, or understand Spanish. Each of these incidents, either taken individually or cumulatively, establish by a clear preponderance of the evidence, that Gullett either knew or was reckless in not knowing that the account was a fraud and knowingly

or recklessly made material misrepresentations about the account to potential investors. Thus, he is liable for violating Section 17(a) of the Securities Act of 1933 and Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 thereunder.

■ Craig also is liable for violating Sections 17(a) of the Securities Act of 1933 and 10(b) of the Securities Exchange Act of 1934 and Rule l0b–5 thereunder. Craig should have known that investors had not deposited $1 billion into the account on the day it was opened, despite telling one potential investor to the contrary. This constitutes a material misrepresentation. A reasonable investor would consider it important to know whether $1 billion had already been deposited in an account because such a deposit gives the account an aura of credibility and legitimacy. Therefore, falsely representing that $1 billion had been deposited in the account puts the account and its credibility in a false light.

■ Like Gullett, Craig was reckless in believing, assuming that he honestly did believe, that the account could produce a return of 85% per month. It is beyond belief that a bank could produce such a high rate of return for its investors. Craig relied exclusively on Gullett's and Hanke's representations to determine the program's legitimacy. He took no independent steps to investigate the program or to investigate Gullett's or Hanke's backgrounds. Craig also never made any effort to determine if the bank documents he had been given were genuine. Additionally, after Gullett learned that the SEC was investigating the bank account and its promoters and told Craig that his lawyer advised him that the program could be considered a security, Craig continued to accept funds for the program. Craig continued to promote the account even after he had been subpoenaed by the SEC regarding the bank account. He must have been aware at that moment that there was a possibility that the account was seriously suspect. Consequently, he was reckless to continue to promote the account after the SEC subpoena and to actually accept another $25,000 deposit from an investor.

The Court finds that Craig was reckless in not knowing or determining that the account was a fraud and recklessly made material misrepresentations about the account to potential investors, including his sons, in his zeal to fund his ministry. The Court is persuaded that Craig was less sophisticated than Gullett and Deyon and did not knowingly attempt to defraud potential investors, including his sons. He was, however, clearly reckless in relying on the information supplied to him by the others connected with the scheme. Thus, he is liable for violating Section 17(a) of the Securities Act of 1933 and Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 thereunder.

■ Finally, Craig and Gullett are liable for violating Section 15(a) of the Securities Exchange Act of 1934. *See* 15 U.S.C. § 78*o*(a)(1). Section 15 makes it unlawful for any broker who is not registered with the SEC to induce the purchase or sale of any security. The parties stipulated that Gullett and Craig were not registered with the SEC and the Court has held that the Bancomer bank program was a security. Further, both Gullett and Craig acted as brokers, as that term is defined in 15 U.S.C. § 78c(a)(4). "The term 'broker' means any person engaged in the business of effecting transactions in securities for the account of others...." *Id.* Both Gullett and Craig solicited investors by phone and in person. Gullett distributed documents and Craig prepared and distributed sales circulars in the hope that potential investors would deposit their money in the account. Indeed, they both actively sought to effect securities transactions. For these reasons, Craig and Gullett were brokers, and thus are liable for violating Section 15(a).

## B. Penalties

### 1. Permanent Injunction

■ The Court hereby issues a permanent injunction against Gullett and Craig, prohibiting them from committing future violations of Section 17(a) of the Securities Act of 1933, Section 10(b) of the Securities Exchange Act of 1934 and Rule l0b–5 thereunder, and Section 15(a) of the Securities Exchange Act of 1934 because their conduct indicates " 'that there is a reasonable likeli-

519

hood of further violation[s] in the future.'" *SEC v. Savoy Ind., Inc.*, 587 F.2d 1149, 1168 (D.C.Cir.1978) (quoting *SEC v. Commonwealth Chemical Secs., Inc.*, 574 F.2d 90, 99–100 (2nd Cir.1978)). Gullett knowingly or recklessly and Craig recklessly made material misrepresentations to potential investors. Their conduct was patently offensive because they exploited the sincere religious beliefs of others in an effort to promote the investment that they knew or should have known was fraudulent. There is no indication that either Craig or Gullett has admitted or will admit wrongful conduct. Craig exploited his position as president and minister of the Door of Faith Church to convince unsuspecting people to give their money to a program that he recklessly endorsed. For his part, Gullett has knowingly and recklessly been involved in fraudulent "Prime Bank" schemes for years. He has given no assurances that he will not continue to do so in the future. Thus, a permanent injunction should issue against both Craig and Gullett.

**2. Disgorgement**

The Court also orders Gullett to disgorge his ill-gotten gains that he received from the Bancomer Bank program that is the subject of this suit. *See SEC v. Huffman,* 996 F.2d 800, 802 (5th Cir.1993). Gullett received ill-gotten gains in the amount of $41,646. This figure represents the amount Gullett was wired from the account, plus the amount wired from the account to Atlas Langford and subsequently given to Gullett, plus the amount sent to Bernard Leuschner, which was meant to satisfy a liability that Gullett and his partners owed to Leuschner. He is hereby ordered to pay to the Registry of the Court the full amount, $41,646, within thirty days of the entry of final judgment.

**3. Civil Penalties**

The SEC requests civil penalties against Craig, Gullett, Hanke, and Dove pursuant to Section 20(d) of the Securities Act of 1933, *see* 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Securities Exchange Act of 1934, *see* 15 U.S.C. § 78u(d)(3). The Court finds that Gullett, Hanke, and Dove each deserve to be penalized in the amount of

$75,000, because their conduct "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" and it "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." 15 U.S.C. § 77t(d)(2)(C); 15 U.S.C. § 78u(d)(3)(B)(iii). Because the Court finds that Craig's conduct was more reckless than fraudulent, a penalty of $25,000 is assessed against Defendant Craig. Such penalties shall be paid to the United States Treasury within thirty days of the entry of final judgment.

**III. Conclusion**

Gullett and Craig are liable for violating Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a), Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 thereunder, 17 C.F.R. § 240.10b–5, and Section 15(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78o(a). They are permanently enjoined from committing future violations of these sections. Gullett is ordered to disgorge all of his ill-gotten gains from the Bancomer program, in the amount of $41,646. Such payment shall be made to the Registry of the Court within thirty days of the entry of final judgment. Gullett, Hanke, and Dove are each penalized $75,000 and Craig is penalized $25,000 for their conduct in the Bancomer program, pursuant to Section 20(d) of the Securities Act of 1933, *see* 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Securities Exchange Act of 1934, *see* 15 U.S.C. § 78u(d)(3). They shall make their payments to the United States Treasury within thirty days of the entry of final judgment.

*SO ORDERED.*